BRANCH ET AL. *v.* SMITH ET AL.

No. 01–1437.   Argued December 10, 2002—Decided March 31, 2003*

*Together with No. 01–1596, *Smith et al.* v. *Branch et al.,* also on appeal from the same court.

256

SCALIA, J., announced the judgment of the Court and delivered the opinion for a unanimous Court with respect to Parts I and II, the opinion of the Court with respect to Part III–A, in which REHNQUIST, C. J., and STEVENS, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined, and an opinion with respect to Parts III–B and IV, in which REHNQUIST, C. J., and KENNEDY and GINSBURG, JJ., joined. KENNEDY, J., filed a concurring opinion, in Part II of which STEVENS, SOUTER, and BREYER, JJ., joined, *post,* p. 282. STEVENS, J., filed an opinion concurring in part and concurring in the judgment, in which SOUTER and BREYER, JJ., joined, *post,* p. 285. O'CONNOR, J., filed an opinion concurring in part and dissenting in part, in which THOMAS, J., joined, *post,* p. 292.

*Robert B. McDuff* argued the cause for appellants in No. 01–1437 and cross-appellees in No. 01–1596. With him on the briefs was *Pamela S. Karlan.*

*James A. Feldman* argued the cause for the United States as *amicus curiae* supporting cross-appellees. With him on the brief were *Solicitor General Olson, Assistant Attorney General Boyd, Deputy Solicitor General Clement, Mark L. Gross,* and *Kevin Russell.*

*Michael B. Wallace* argued the cause for appellees in No. 01–1437 and cross-appellants in No. 01–1596. With him

on the briefs were *Arthur F. Jernigan, Jr.*, and *Grant M. Fox.*†

JUSTICE SCALIA announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and III–A, and an opinion with respect to Parts III–B and IV, in which THE CHIEF JUSTICE, JUSTICE KENNEDY, and JUSTICE GINSBURG join.

In these cases, we decide whether the District Court properly enjoined a Mississippi state court's proposed congressional redistricting plan and whether it properly fashioned its own congressional reapportionment plan rather than order at-large elections.

I

The 2000 census caused Mississippi to lose one congressional seat, reducing its representation in the House of Representatives from five Members to four. The state legislature, however, failed to pass a new redistricting plan after the decennial census results were published in 2001. In anticipation of the March 1, 2002, state-law deadline for the qualification of candidates, see Miss. Code Ann. § 23–15–299 (Lexis 2001), appellant and cross-appellee Beatrice Branch and others (state plaintiffs) filed suit in a Mississippi State Chancery Court in October 2001, asking the state court to issue a redistricting plan for the 2002 congressional elections. In November 2001, appellee and cross-appellant John Smith and others (federal plaintiffs) filed a similar action under Rev. Stat. § 1979, 42 U. S. C. § 1983, in the United States District Court for the Southern District of Mississippi, claiming that the current districting plan, Miss. Code Ann. § 23–15–

---

†Briefs of *amici curiae* urging reversal in No. 01–1437 were filed for the National Association for the Advancement of Colored People et al. by *J. Gerald Hebert* and *Robert Rubin;* and for the Nationalist Movement by *Richard Barrett.*

*John P. Krill, Jr.*, filed a brief for Robert C. Jubelirer et al. as *amici curiae* urging affirmance in No. 01–1437.

1037 (Lexis 2001), dividing the State into five, rather than four, congressional districts, was unconstitutional and unenforceable. The federal plaintiffs asked the District Court to enjoin the current redistricting plan, and subsequently asked it to enjoin any plan developed by a state court (which they asserted would violate Article I, §4, of the Constitution, and, in any event, could not be enforced until the state court's assertion of redistricting authority was precleared under §5 of the Voting Rights Act of 1965, 79 Stat. 439, 42 U. S. C. §1973c), and asked that it order at-large elections pursuant to Miss. Code Ann. §23–15–1039 (2001) and 46 Stat. 26, 2 U. S. C. §2a(c)(5), or, alternatively, devise its own redistricting plan.

A three-judge District Court was convened pursuant to 28 U. S. C. §2284. Initially the District Court did not interfere with the State Chancery Court's efforts to develop a redistricting plan. In an order filed on December 5, 2001, *Smith v. Clark*, 189 F. Supp. 2d 502 (SD Miss.), the District Court permitted the state plaintiffs to intervene and deferred ruling on the federal plaintiffs' motion for a preliminary injunction. In staying its hand, the District Court recognized that "'the Constitution leaves with the States primary responsibility for apportionment of their federal congressional . . . districts,'" *id.,* at 503 (quoting *Growe v. Emison,* 507 U. S. 25, 34 (1993)), but concluded that "if it is not clear to this court by January 7, 2002 that the State authorities can have a redistricting plan in place by March 1, we will assert our jurisdiction . . . and if necessary, we will draft and implement a plan for reapportioning the state congressional districts," 189 F. Supp. 2d, at 503; see also 189 F. Supp. 2d 503, 505–506 (SD Miss. 2002).

On the eve of the State Chancery Court trial, the Mississippi Supreme Court denied petitions for writs of prohibition and mandamus filed by a state defendant and others challenging the Chancery Court's jurisdiction to engage in congressional redistricting. It held that the Chancery Court

had jurisdiction to issue a redistricting plan. *In re Mauldin*, Civ. No. 2001–M–01891 (Dec. 13, 2001), App. to Juris. Statement 110a. Following trial, on December 21, 2001, the State Chancery Court adopted a redistricting plan submitted by the state plaintiffs. On December 26, the state attorney general submitted that plan, along with the Mississippi Supreme Court's *Mauldin* decision (which arguably changed the process for drawing congressional districts by authorizing the Chancery Court to create a redistricting plan), to the Department of Justice (DOJ) for preclearance. On February 14, 2002, DOJ sent a letter to the state attorney general requesting additional information about the *Mauldin* decision, because "the information sent to date regarding this change in voting procedure is insufficient . . . ." App. to Juris. Statement 193a. The letter advised that the "sixty-day review period will begin when we receive the information specified." *Id.*, at 196a. The state attorney general provided additional information on February 19 and 20, 2002.

Meanwhile, in January 2002, the District Court, expressing "serious doubts whether the Mississippi Supreme Court's Order and the plan adopted by the Chancery Court pursuant to that order will be precleared prior to the March 1 candidate qualification deadline," 189 F. Supp. 2d, at 508, had begun to develop its own redistricting plan, *id.*, at 511. On February 4, 2002, it promulgated a redistricting plan to be used absent the timely preclearance of the Chancery Court plan. 189 F. Supp. 2d 512 (SD Miss.). On February 19, it ordered that, if the Chancery Court redistricting plan was not "precleared before the close of business on Monday, February 25, 2002," then the District Court's plan would fix the Mississippi congressional districts for the 2002 elections. 189 F. Supp. 2d 529, 548. February 25th came and went with no action by DOJ. On February 26, the District Court enjoined the State from using the Chancery Court plan and ordered use of the District Court's own plan in the 2002 elections and all succeeding elections until the State produced

a constitutional redistricting plan that was precleared. 189 F. Supp. 2d 548, 559. The court said that the basis for its injunction and order was "reflected in our opinion of February 19, that is, the failure of the timely preclearance under § 5 of the Voting Rights Act of the Hinds County Chancery Court's plan." *Id.*, at 549. However, "in the event that on appeal it is determined that we erred in our February 19 ruling," the court put forth as its "alternative holding" that Article I, § 4, of the United States Constitution prohibited the State Chancery Court from issuing a redistricting plan without express authorization from the state legislature. *Ibid.*

The State did not file a notice of appeal. On April 1, 2002, DOJ informed the State in a letter that "it would be inappropriate for the Attorney General to make a determination concerning [the State's preclearance] submission now" because the District Court's injunction rendered the state-court plan incapable of administration. App. 29.

The state plaintiffs—intervenors in the District Court—filed a timely notice of appeal from the District Court and a jurisdictional statement. The federal plaintiffs filed a jurisdictional statement on conditional cross-appeal. We noted probable jurisdiction in both appeals and consolidated them. 536 U. S. 903 (2002).

## II

At the outset we should observe two critical distinctions between these cases and the one that was before us in *Growe* v. *Emison*, 507 U. S. 25 (1993). In *Growe*, the Federal District Court had refused to abstain or defer to state-court redistricting proceedings. *Id.*, at 30–31. In reversing, we reminded the federal courts of " 'what has been said on many occasions: reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court.' " *Id.*, at 34 (quoting *Chapman* v. *Meier*, 420 U. S. 1, 27 (1975)). We held that "[a]bsent evidence that these state branches will fail *timely* to perform

that duty, a federal court must neither affirmatively obstruct state reapportionment nor permit federal litigation to be used to impede it." 507 U. S., at 34 (emphasis added). In the present cases, unlike in *Growe*, there is no suggestion that the District Court failed to allow the state court adequate opportunity to develop a redistricting plan. The second distinction is that the state-court plan here, unlike that in *Growe*, was subject to § 5 of the Voting Rights Act, 42 U. S. C. § 1973c. The District Court rested its injunction of the state-court plan on the ground that necessary preclearance had not been obtained. It is that challenged premise that we examine first.

Section 5 of the Voting Rights Act provides that whenever a covered jurisdiction, such as Mississippi, see 30 Fed. Reg. 9897 (1965), "shall enact or seek to administer" a change in "any voting qualification or prerequisite to voting, or standard, practice, or procedure," the State must obtain preclearance from the District Court for the District of Columbia or the Attorney General before the change may be enforced. 42 U. S. C. § 1973c. The Act requires preclearance of *all* voting changes, *ibid.;* see *Dougherty County Bd. of Ed.* v. *White*, 439 U. S. 32, 38–39 (1978), and there is no dispute that this includes voting changes mandated by order of a state court, see, *e. g., In re McMillin*, 642 So. 2d 1336, 1339 (Miss. 1994). Rather, the controversy pertains to the proviso in § 1973c to the effect that, where the preclearance submission is made to the Attorney General, the voting change may be enforced if "the Attorney General has not interposed an objection within sixty days after such submission . . . ."

Appellants in No. 01–1437 (originally the state plaintiffs) assert that the District Court erred in believing that the Chancery Court's plan lacked preclearance. It was automatically rendered enforceable, they contend, by DOJ's failure to object within the 60-day period running from the state attorney general's initial submission on December 26, 2001— or, in the alternative, it was subsequently rendered enforce-

able by DOJ's failure to object within the 60-day period running from the state attorney general's submission of additional information on February 20, 2002. We consider each of these contentions in turn.

## A

Under § 5, a jurisdiction seeking administrative preclearance must prove that the change is nondiscriminatory in purpose and effect. *Reno* v. *Bossier Parish School Bd.,* 528 U. S. 320, 328 (2000). It bears the burden of providing the Attorney General information sufficient to make that proof, *Georgia* v. *United States,* 411 U. S. 526, 537–539 (1973), and failure to do so will cause the Attorney General to object, see *ibid.;* 28 CFR § 51.52(c) (2002). In DOJ's view, however, incomplete state submissions do not start the 60-day clock for review. See §§ 51.27, 51.37. The regulations implementing § 5 authorize a DOJ request for additional information from a jurisdiction that has initially "omitted information considered necessary for the evaluation of the submission." § 51.37(a). If the jurisdiction responds by supplying the additional information (or stating that it is unavailable), the 60-day clock begins to run from the date the response is received. § 51.37(c). We have upheld these regulations as being "wholly reasonable and consistent with the Act." *Georgia* v. *United States, supra,* at 541; accord, *Morris* v. *Gressette,* 432 U. S. 491, 504, n. 19 (1977).

DOJ's February 14 request for additional information was within the Attorney General's discretion under 28 CFR § 51.37, thereby postponing the 60-day time period for objections until the requested information was received. The request was neither frivolous nor unwarranted. See *Georgia* v. *United States, supra,* at 541, n. 13. DOJ believed that the Mississippi Supreme Court's *Mauldin* order, holding that the Chancery Court had jurisdiction to engage in redistricting, was a change in voting procedures, and it sought additional information demonstrating that this change would not have

the purpose or effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, as required under § 5. The fact that the District Court identified the same issue as posing a hurdle to preclearance further suggests that DOJ's request was not frivolous. 189 F. Supp. 2d, at 508–509. The request for more information was not frivolous or unwarranted at the time it was made, regardless of whether it ultimately develops that *Mauldin* and the Chancery Court's assertion of jurisdiction to redistrict are not voting changes that required preclearance.

## B

Appellants contend that even if the State Chancery Court's plan was not precleared by operation of law on February 25, 2002, it was precleared on April 22, 60 days after the state attorney general submitted the additional information requested. We think not.

Section 5 provides that "[w]henever a [covered jurisdiction] shall *enact or seek to administer*" a voting change, such a change may be enforced if it is submitted to the Attorney General and there is no objection by the Attorney General within 60 days. 42 U. S. C. § 1973c (emphasis added). Clearly the State Chancery Court's redistricting plan was not "enacted" by the State of Mississippi. An "enactment" is the product of legislation, not adjudication. See Webster's New International Dictionary 841 (2d ed. 1949) (defining "enact" as "[t]o make into an act or law; esp., to perform the legislative act with reference to (a bill) which gives it the validity of law"); Black's Law Dictionary 910 (7th ed. 1999) (defining "legislate" as "[t]o make or enact laws"). The web of state and federal litigation before us is the consequence of the Mississippi Legislature's *failure* to enact a plan. The Chancery Court's redistricting plan, then, could be eligible for preclearance only if the State was "seek[ing] to administer" it.

There is no doubt that the State was "seek[ing] to administer" the changes for which preclearance was sought when the Mississippi attorney general made his initial submission to DOJ on December 26, 2001, and when he provided additional information regarding the state-court plan on February 20, 2002. On February 26, 2002, however, the District Court "enjoined [the State] from implementing the congressional redistricting plan adopted by the [state court]," 189 F. Supp. 2d, at 559, and the State *never appealed* that injunction. Uncontrovertibly, the State was no longer "seek[ing] to administer" the state-court plan, and thus the 60-day time period for DOJ review was no longer running. The passing of 60 days from the date of the State's February 20, 2002, submission of the additional requested information had no legal significance, and the state-court plan was not rendered enforceable by operation of law.

Appellants' argument—that their appeal, as *intervenors*, is sufficient to demonstrate that the State still "seek[s] to administer" the state-court plan—is invalid on its face. The actions of a private party are not the actions of a State and cannot satisfy the prerequisite to §5 preclearance.

## C

Since we affirm the injunction on the basis of the District Court's principal stated ground that the state-court plan had not been precleared and had no prospect of being precleared in time for the 2002 election, we have no occasion to address the District Court's alternative holding that the State Chancery Court's redistricting plan was unconstitutional—a holding that the District Court specified was set forth to cover the eventuality of the principal stated ground's being rejected on appeal—and therefore we vacate it as a basis for the injunction. The District Court's alternative holding is not to be regarded as supporting the injunction we have affirmed on the principal ground, or as binding upon state and

federal officials should Mississippi seek in the future to administer a redistricting plan adopted by the Chancery Court.

### III

Having determined that the District Court properly enjoined enforcement of the state-court redistricting plan, we turn to the propriety of the redistricting plan that the District Court itself adopted. Cross-appellees in No. 01–1596 (originally the state plaintiffs) and the United States, as *amicus curiae*, argue that the District Court was required to draw (as it did) single-member congressional districts; cross-appellants in No. 01–1596 (originally the federal plaintiffs) contend that it was required to order at-large elections for the congressional seats. We must decide whether, as cross-appellees contend, the District Court was governed by the provisions of 2 U. S. C. § 2c; or, as cross-appellants contend, by the provisions of 2 U. S. C. § 2a(c)(5).

### A

Article I, § 4, cl. 1, of the Constitution provides that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof . . . ." It reserves to Congress, however, the power "at any time by Law [to] make or alter such Regulations, except as to the Places of chusing Senators." *Ibid.* Pursuant to this authority, Congress in 1929 enacted the current statutory scheme governing apportionment of the House of Representatives. 2 U. S. C. §§ 2a(a), (b). In 1941, Congress added to those provisions a subsection addressing what is to be done pending redistricting:

> "Until a State is redistricted in the manner provided by the law thereof after any apportionment, the Representatives to which such State is entitled under such apportionment shall be elected in the following manner: (1) If there is no change in the number of Representatives, they shall be elected from the districts then

prescribed by the law of such State, and if any of them are elected from the State at large they shall continue to be so elected; (2) if there is an increase in the number of Representatives, such additional Representative or Representatives shall be elected from the State at large and the other Representatives from the districts then prescribed by the law of such State; (3) if there is a decrease in the number of Representatives but the number of districts in such State is equal to such decreased number of Representatives, they shall be elected from the districts then prescribed by the law of such State; (4) if there is a decrease in the number of Representatives but the number of districts in such State is less than such number of Representatives, the number of Representatives by which such number of districts is exceeded shall be elected from the State at large and the other Representatives from the districts then prescribed by the law of such State; or (5) if there is a decrease in the number of Representatives and the number of districts in such State exceeds such decreased number of Representatives, they shall be elected from the State at large." § 2a(c).

In 1967, 26 years after § 2a(c) was enacted, Congress adopted § 2c, which provides, as relevant here:

"In each State entitled in the Ninety-first Congress or in any subsequent Congress thereafter to more than one Representative under an apportionment made pursuant to the provisions of section 2a(a) of this title, there shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established, no district to elect more than one Representative . . . ."

The tension between these two provisions is apparent: Section 2c requires States entitled to more than one Repre-

sentative to elect their Representatives from single-member districts, rather than from multimember districts or the State at large. Section 2a(c), however, requires multimember districts or at-large elections in certain situations; and with particular relevance to the present cases, in which Mississippi, by reason of the 2000 census, lost a congressional seat, § 2a(c)(5) requires at-large elections. Cross-appellants would reconcile the two provisions by interpreting the introductory phrase of § 2a(c) ("Until a State is redistricted in the manner provided by the law thereof after any apportionment") and the phrase "established by law" in § 2c to refer exclusively to *legislative* redistricting—so that § 2c tells the legislatures what to do (single-member districting) and § 2a(c) provides what will happen *absent* legislative action—in the present cases, the mandating of at-large elections.

The problem with this reconciliation of the provisions is that the limited role it assigns to § 2c (governing legislative apportionment but not judicial apportionment) is contradicted both by the historical context of § 2c's enactment and by the consistent understanding of all courts in the almost 40 years since that enactment. When Congress adopted § 2c in 1967, the immediate issue was precisely the involvement of the courts in fashioning electoral plans. The Voting Rights Act of 1965 had recently been enacted, assigning to the federal courts jurisdiction to involve themselves in elections. See 79 Stat. 439 (as amended and codified at 42 U. S. C. § 1973 *et seq.*). Even more significant, our decisions in *Baker* v. *Carr*, 369 U. S. 186 (1962), *Wesberry* v. *Sanders*, 376 U. S. 1 (1964), and *Reynolds* v. *Sims*, 377 U. S. 533 (1964), had ushered in a new era in which federal courts were overseeing efforts by badly malapportioned States to conform their congressional electoral districts to the constitutionally required one-person, one-vote standards. In a world in which the role of federal courts in redistricting disputes had been transformed from spectating, see *Colegrove* v. *Green*, 328 U. S. 549 (1946) (opinion of Frankfurter, J.), to directing,

the risk arose that judges forced to fashion remedies would simply order at-large elections.

At the time Congress enacted § 2c, at least six District Courts, two of them specifically invoking 2 U. S. C. § 2a(c)(5), had suggested that if the state legislature was unable to redistrict to correct malapportioned congressional districts, they would order the State's entire congressional delegation to be elected at large. On March 26, 1964, a three-judge District Court ordered that, pending enactment of a constitutional redistricting plan by the Michigan Legislature, all Michigan Representatives would be elected at large. *Calkins* v. *Hare*, 228 F. Supp. 824, 830 (ED Mich. 1964). On October 19, 1964, a three-judge District Court entered a similar order for the State of Texas. See *Bush* v. *Martin*, 251 F. Supp. 484, 489, and n. 11, 490, and n. 17 (SD Tex. 1966). On February 3, 1965, a three-judge District Court in Arkansas, whose House delegation had decreased from six to four Members after the 1960 census, stated that under § 2a(c)(5), "if the Legislature . . . had taken no action [after the 1960 apportionment] the congressmen would have been required to run at large," and that the same reasoning would compel the court to require at-large elections if the legislature adopted malapportioned congressional districts. *Park* v. *Faubus*, 238 F. Supp. 62, 66 (ED Ark. 1965). On August 5, 1966, a three-judge District Court in Missouri, whose House delegation had decreased from 11 to 10 Members after the 1960 census, informed the State that if it was unable to redistrict in accordance with the Constitution, then pursuant to the "command of Section 2(a)(c) *[sic]*," "the congressional elections for Missouri will be ordered conducted at large until new and constitutional districts are created." *Preisler* v. *Secretary of State of Missouri*, 257 F. Supp. 953, 981, 982 (WD Mo. 1966), aff'd, 385 U. S. 450 (1967) *(per curiam)*. In *Meeks* v. *Anderson*, 229 F. Supp. 271, 273–274 (Kan. 1964), and *Baker* v. *Clement*, 247 F. Supp. 886, 897–898 (MD Tenn. 1965), three-judge District Courts stayed their hands but

held forth the possibility of requiring at-large elections. With all this threat of judicially imposed at-large elections, and (as far as we are aware) no threat of a legislatively imposed change to at-large elections, it is most unlikely that § 2c was directed solely at legislative reapportionment.

Nor have the courts ever thought so. To the contrary, every court that has addressed the issue has held that § 2c requires courts, when they are remedying a failure to redistrict constitutionally, to draw single-member districts whenever possible. The first court to examine § 2c, just two weeks after the statute was enacted, was the three-judge District Court in Missouri that had previously threatened to order at-large elections in accordance with § 2a(c)(5). In its decision on December 29, 1967, that court observed that the enactment of § 2c had "relieved [it] of the prior existing Congressional command to order that the 1968 and succeeding congressional elections in Missouri be held at large," *Preisler* v. *Secretary of State of Missouri*, 279 F. Supp. 952, 969 (WD Mo. 1967), aff'd, 394 U. S. 526 (1969), and accordingly reversed its prior position and stated that it would fashion a districting plan if the State failed to fulfill its duty. Four years later, the Supreme Court of Virginia denied a writ of mandamus directing at-large elections to replace an allegedly unconstitutional Redistricting Act, on the ground that by reason of § 2c "we cannot legally issue the writ." *Simpson* v. *Mahan*, 212 Va. 416, 417, 185 S. E. 2d 47, 48 (1971). The next year the Supreme Court of California reached the same conclusion that § 2c required it to establish single-member districts, see *Legislature* v. *Reinecke*, 6 Cal. 3d 595, 602–603, 492 P. 2d 385, 390 (1972), a conclusion that it reaffirmed in 1982, see *Assembly of State of Cal.* v. *Deukmejian*, 30 Cal. 3d 638, 664, 639 P. 2d 939, 955 (1982). In *Shayer* v. *Kirkpatrick*, 541 F. Supp. 922, 926 (WD Mo.), aff'd *sub nom. Schatzle* v. *Kirkpatrick*, 456 U. S. 966 (1982), the District Court concluded that "nothing in section 2c suggests any limitation on its applicability," and declined to order at-large elections

pursuant to § 2a(c)(5) because § 2c "appears to prohibit at-large elections." And in *Carstens* v. *Lamm,* 543 F. Supp. 68 (Colo. 1982), the District Court reached a substantially identical result, although contemplating that § 2a(c) provided a "stop-gap measure" in the "event that no constitutional redistricting plan exists on the eve of a congressional election, and there is not enough time for either the Legislature or the courts to develop an acceptable plan," *id.,* at 77, and n. 23.

It bears noting that this Court affirmed two of the District Court decisions described above, see *Preisler, supra,* and *Shayer, supra,* one without discussing § 2c, and one summarily. And in 1971 we observed in dictum that "[i]n 1967, Congress reinstated the single-member district requirement" that had existed before the enactment of § 2a(c). *Whitcomb* v. *Chavis,* 403 U. S. 124, 159, n. 39 (1971).

Of course the implausibility (given the circumstances of its enactment) that § 2c was meant to apply only to legislative reapportionment, and the unbroken unanimity of state and federal courts in opposition to that interpretation, would be of no consequence if the text of § 2c (and of § 2a(c)) unmistakably demanded that interpretation. But it does not. Indeed, it is more readily susceptible of the opposite interpretation.

The clause "there shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled" could, to be sure, be so interpreted that the phrase "by law" refers only to legislative action. Its more common meaning, however, encompasses judicial decisions as well. See, *e. g., Hope* v. *Pelzer,* 536 U. S. 730, 741 (2002) (referring to judicial decisions as "established law" in qualified immunity context); *Swidler & Berlin* v. *United States,* 524 U. S. 399, 407 (1998) (referring to judicial decisions as "established law" in the attorney-client privilege context); *United States* v. *Frady,* 456 U. S. 152, 166 (1982) (referring to the judicially established standard of review for a 28 U. S. C. § 2255 motion as "long-established law"); see

also §2254(d)(1) ("clearly established Federal law, as determined by the Supreme Court of the United States"); *Marbury* v. *Madison,* 1 Cranch 137, 177 (1803) (it is "the province and duty of the judicial department to say what the law is").

We think, therefore, that while §2c assuredly envisions legislative action, it also embraces action by state and federal courts when the prescribed legislative action has not been forthcoming. We might note that giving "by law" its less common meaning would cause the immediately following clause of §2c ("and Representatives shall be elected only from districts *so established*" (emphasis added)) to exclude *all* courts from redistricting, including even state courts acting pursuant to state legislative authorization in the event of legislative default. It is hard to see what plausible congressional purpose this would serve. When, as here, the situation (a decrease in the number of Representatives, all of whom were formerly elected from single-member districts) enables courts to prescribe at-large elections under paragraph (5) of §2a(c) (assuming that section subsists, see *infra,* at 273), it can be said that there is a constitutional fallback. But what would occur if the situation called for application of paragraphs (1) to (4) of §2a(c), none of which is constitutionally enforceable when (as is usual) the decennial census has shown a proscribed degree of disparity in the voting population of the established districts? The absolute prohibition of §2c ("Representatives shall be elected only from [single-member] districts [legislatively] established") would be subject to no exception, and courts would (despite *Baker* v. *Carr*) be congressionally forbidden to act when the state legislature has not redistricted. Only when it is utterly unavoidable should we interpret a statute to require an unconstitutional result—and that is far from the situation here.

In sum, §2c is as readily enforced by courts as it is by state legislatures, and is just as binding on courts—federal or state—as it is on legislatures.

## B

Having determined that in enacting 2 U. S. C. § 2c, Congress mandated that States are to provide for the election of their Representatives from single-member districts, and that this mandate applies equally to courts remedying a state legislature's failure to redistrict constitutionally, we confront the remaining question: what to make of § 2a(c)? As observed earlier, the texts of § 2c and § 2a(c)(5) are in tension. Representatives cannot be "elected only from districts," § 2c, while being elected "at large," § 2a(c). Some of the courts confronted with this conflict have concluded that § 2c repeals § 2a(c) by implication. See *Shayer* v. *Kirkpatrick*, 541 F. Supp., at 927; *Assembly of State of Cal.* v. *Deukmejian*, 30 Cal. 3d, at 663–664, 639 P. 2d, at 954. There is something to be said for that position—especially since paragraphs (1) through (4) of § 2a(c) have become (because of postenactment decisions of this Court) in virtually all situations plainly unconstitutional. (The unlikely exception is the situation in which the decennial census makes no districting change constitutionally necessary.) Eighty percent of the section being a dead letter, why would Congress adhere to the flotsam of paragraph (5)?

We have repeatedly stated, however, that absent "a clearly expressed congressional intention," *Morton* v. *Mancari*, 417 U. S. 535, 551 (1974), "repeals by implication are not favored," *Universal Interpretive Shuttle Corp.* v. *Washington Metropolitan Area Transit Comm'n*, 393 U. S. 186, 193 (1968). An implied repeal will only be found where provisions in two statutes are in "irreconcilable conflict," or where the latter Act covers the whole subject of the earlier one and "is clearly intended as a substitute." *Posadas* v. *National City Bank*, 296 U. S. 497, 503 (1936). So while there is a strong argument that § 2c was a substitute for § 2a(c), we think the better answer is that § 2a(c)—where what it prescribes is constitutional (as it is with regard to paragraph (5))—continues to apply.

Section 2a(c) is, of course, only *provisionally* applicable. It governs the manner of election for Representatives in any election held "[u]ntil a State is redistricted in the manner provided by the law thereof after any apportionment." That language clashes with §2c only if it is interpreted to forbid judicial redistricting unless the state legislature has first acted. On that interpretation, whereas §2c categorically instructs courts to redistrict, §2a(c)(5) forbids them to do anything but order at-large elections unless the state legislature has acted. But there is of course no need for such an interpretation. "Until a State is redistricted" can certainly refer to redistricting by courts as well as by legislatures. Indeed, that interpretation would seem the preferable one even if it were not a necessary means of reconciling the two sections. Under prior versions of §2a(c), its default or stopgap provisions were to be invoked for a State "until the *legislature* of such State . . . [had] redistrict[ed] such State." Act of Jan. 16, 1901, ch. 93, §4, 31 Stat. 734 (emphasis added); see Act of Feb. 7, 1891, ch. 116, §4, 26 Stat. 736 ("until such State be redistricted as herein prescribed by the *legislature* of said State" (emphasis added)); Act of Feb. 25, 1882, ch. 20, §3, 22 Stat. 6 ("shall be elected at large, unless the *Legislatures* of said States have provided or shall otherwise provide" (emphasis added)). These provisions are .in stark contrast to the text of the current §2a(c): "[u]ntil a State is redistricted in the manner provided by the law thereof."

If the more expansive (and more natural) interpretation of §2a(c) is adopted, its condition can be met—and its demand for at-large elections suspended—by the very court that follows the command of §2c. For when a court, state or federal, redistricts pursuant to §2c, it necessarily does so "in the manner provided by [state] law." It must follow the "policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature," except, of course,

when "adherence to state policy . . . detract[s] from the requirements of the Federal Constitution." *White* v. *Weiser*, 412 U. S. 783, 795 (1973). Federal constitutional prescriptions, and federal statutory commands such as that of § 2c, are appropriately regarded, for purposes of § 2a(c), as a part of the state election law.

Thus, § 2a(c) is inapplicable *unless* the state legislature, and state and federal courts, have all failed to redistrict pursuant to § 2c. How long is a court to await that redistricting before determining that § 2a(c) governs a forthcoming election? Until, we think, the election is so imminent that no entity competent to complete redistricting pursuant to state law (including the mandate of § 2c) is able to do so without disrupting the election process. Only then may § 2a(c)'s stopgap provisions be invoked. Thus, § 2a(c) cannot be properly applied—neither by a legislature nor a court—as long as it is feasible for federal courts to effect the redistricting mandated by § 2c. So interpreted, § 2a(c) continues to function as it always has, as a last-resort remedy to be applied when, on the eve of a congressional election, no constitutional redistricting plan exists and there is no time for either the State's legislature or the courts to develop one. Cf. *Carstens* v. *Lamm*, 543 F. Supp., at 77–78.

There remains to be considered Mississippi's at-large election provision, which reads as follows:

> "Should an election of representatives in Congress occur after the number of representatives to which the state is entitled shall be changed, in consequence of a new apportionment being made by Congress, and before the districts shall have been changed to conform to the new apportionment, representatives shall be chosen as follows: In case the number of representatives to which the state is entitled be increased, then one (1) member shall be chosen in each district as organized, and the additional member or members shall be chosen by the electors of the state at large; and if the number of repre-

sentatives shall be diminished, then the whole number shall be chosen by the electors of the state at large." Miss. Code Ann. § 23–15–1039 (Lexis 2001).

There has been no interpretation of this provision by the Mississippi courts. We believe it was designed to track 2 U. S. C. §§ 2a(c)(2) and (5), and should be deemed operative when those provisions would be. That is to say, (1) the phrase "and before the districts shall have been changed to conform to the new apportionment" envisions both legislatively and judicially prescribed change, and (2) the statute does not come into play as long as it remains feasible for a state or federal court to complete redistricting. In these cases, the District Court properly completed the redistricting of Mississippi pursuant to 2 U. S. C. § 2c and thus neither Mississippi Code § 23–15–1039 nor 2 U. S. C. § 2a(c) was applicable.

## IV

JUSTICE O'CONNOR's opinion concurring in part and dissenting in part (hereinafter dissent) agrees that the District Court properly acted to remedy a constitutional violation, see *post*, at 300–301, but contends that it should have looked to § 2a(c) rather than § 2c in selecting an appropriate remedy. We think not. We have explained why it *makes sense* for § 2c to apply until there is no longer any reasonable prospect for redistricting according to state law—whereupon § 2a(c) applies. If, like the dissent, we were to forgo such analysis and simply ask, in the abstract, which of the two provisions has primacy, we would probably *still* select § 2c—the only one cast in absolute, rather than conditional, terms. The dissent gives not the hint of a reason why *it* believes § 2a(c) has primacy. It says that "[t]he text of § 2a(c) directs federal courts to order at-large elections '[u]ntil a State is redistricted in the manner provided by the law thereof.'" *Post*, at 301. But it is *equally* true that § 2c directs federal courts to redistrict *absolutely and without qualification*.

The dissent does contemplate a role for federal courts in redrawing congressional districts, but only "*after* a State has been redistricted" in the first instance. *Post*, at 300. It is not entirely clear which entities the dissent considers competent to do this initial redistricting—certainly the legislature, and perhaps also state courts, but only if such "courts are part of the 'manner provided by the law thereof.'" *Post*, at 300, n. 1. But the dissent also says that "a court should enforce § 2a(c) *before* a 'State is redistricted in the manner provided by the law thereof,' and a court should enforce § 2c *after* a State" has been initially redistricted, *post*, at 300— which (if one takes the words at face value) leaves no room for any court to do the initial redistricting. We assume the dissent does not mean precisely what it has said.

The dissent implicitly differentiates between federal and state courts—effectively holding that *state* courts may undertake the initial redistricting that would satisfy § 2a(c)'s prerequisite, but *federal* courts may not. It presumably rests this distinction upon the belief that state courts are capable of redistricting "'in the manner provided by the law thereof,'" whereas federal courts are not. See *post*, at 300, n. 1. To read that phrase as potentially including state— but not federal—courts, the dissent takes the word "manner" to refer to *process* or *procedures*, rather than *substantive requirements*. See *ibid.* (If the State's *process* for redistricting includes courts, then and only then may courts redistrict, rendering § 2a(c) inapplicable.) But such a reading renders the phrase "in the manner provided by the law thereof" redundant of the requirement that the State be "redistricted." *Of course* the State has not been redistricted if districts have been drawn by someone without authority to redistrict. Should an ambitious county clerk or individual legislator sit down and draw up a districting map, no one would think that the State has, within the meaning of the statute, been "redistricted." In our view, the word "manner" refers to the State's substantive "policies and prefer-

ences" for redistricting, *White* v. *Weiser*, 412 U. S., at 795, as expressed in a State's statutes, constitution, proposed reapportionment plans, see *ibid.*, or a State's "traditional districting principles," *Abrams* v. *Johnson*, 521 U. S. 74, 86 (1997); see also *Upham* v. *Seamon*, 456 U. S. 37, 42–43 (1982) *(per curiam)*. Thus, when a federal court redistricts a State in a manner that complies with that State's substantive districting principles, it does so "'in the manner provided by the law thereof.'" See *supra*, at 274–275.* While it certainly remains preferable for the State's legislature to complete its constitutionally required redistricting pursuant to the requirements of § 2c, see *Abrams, supra*, at 101, or for the state courts to do so if they can, see *Growe*, 507 U. S., at 34, we have long since crossed the Rubicon that seems to impede the dissent, see, *e. g., Baker* v. *Carr*, 369 U. S. 186 (1962). When the State, through its legislature or other authorized body, cannot produce the needed decision, then federal courts are "left to embark on [the] delicate task" of redistricting, *Abrams, supra*, at 101.

The dissent claims that we have read the statutory phrase "[u]ntil a State is redistricted" to mean "[u]ntil . . . the election is so imminent that no entity competent to complete redistricting pursuant . . . to the mandate of § 2c . . . is able to do so without disrupting the election process." *Post*, at 298. From that premise, it proceeds to mount a vigorous (and, in the principles it espouses, highly edifying) "plain meaning" attack upon our holding. Unfortunately, the premise is patently false. We, no less than the dissent, acknowledge that

---

*Contrary to the dissent's assertion, *post*, at 300, n. 1, our reading creates no conflict with *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89 (1984). Here a federal court granted relief on the basis of *federal* law—specifically, the Federal Constitution. The District Court did not "instruc[t] state officials on how to conform their conduct to state law," *id.*, at 106; rather, it deferred to the State's "policies and preferences" for redistricting, *White* v. *Weiser*, 412 U. S. 783, 795 (1973). Far from intruding on state sovereignty, such deference respects it.

"the text tells us 'how long' § 2a(c) should govern: *'until* a State is redistricted in the manner provided by the law thereof,'" *post*, at 299. The issue is not how long § 2a(c) governs, but how long a court (under the continuing mandate of § 2a(c)) should wait before ordering an at-large election. The dissent treats § 2a(c) as though it prescribes (in its application to the facts of the present case) the immediate establishment of statewide districts (*i. e.*, an at-large election) for all Representatives. It prescribes no such thing. All it says is that "[u]ntil [the] State is redistricted in the manner provided by the law thereof," Representatives "shall be elected from the State at large." The only point at which § 2a(c) issues a command—the only point at which it bites— is at *election time*. Only if, *at election time*, redistricting "in the manner provided by [state] law" has not occurred, does § 2a(c) become operative.

So despite the dissent's ardent protestations to the contrary, see *ibid.*, the dissent, no less than we, must confront the question "[h]ow long is a court to await that redistricting before determining that § 2a(c) governs a forthcoming election?" Surely the dissent cannot possibly believe that, since "the text tells us 'how long' § 2a(c) should govern," *ibid.*, a court can declare, immediately after congressional reapportionment, and before the state legislature has even had a chance to act, that the State's next elections for Representatives will be at large. We say that the state legislature (and the state and federal courts) should be given the full time available—right up until the time when further delay will disrupt the election process—to reapportion according to state law. Since the dissent disagrees with that, we wonder what its own timeline might be. But to claim that there is no timeline—simply to assert that "[§ ]2a(c) contains *no* imminence requirement," *ibid.*—is absurd.

The dissent suggests that our reading of § 2c runs afoul of the Court's anticommandeering jurisprudence, see *post*, at 301–302, but in doing so the dissent fails to recognize that

the state legislature's obligation to prescribe the "Times, Places and Manner" of holding congressional elections is grounded in Article I, §4, cl. 1, of the Constitution itself and not any mere statutory requirement. Here, as acknowledged by the dissent, the federal plaintiffs "alleged a constitutional violation"—failure to provide for the election of the proper number of Representatives in accordance with Article I, §2, cl. 1—"and the federal court drew a plan to remedy that violation," *post*, at 301. In crafting its remedy, the District Court appropriately followed the "Regulations" Congress prescribed in §2c—"Regulations" that Article I, §4, cl. 1, of the Constitution expressly permits Congress to make, see *supra*, at 266. To be sure, §2c "envisions legislative action," *supra*, at 272, but in the context of Article I, §4, cl. 1, such "Regulations" are *expressly* allowed. In enacting §2c (and §2a(c), for that matter), Congress was not placing a statutory obligation on the state legislatures as it was in *New York* v. *United States*, 505 U. S. 144 (1992); rather, it was regulating (as the Constitution specifically permits) the manner in which a State is to fulfill its pre-existing constitutional obligations under Article I, §§2 and 4. Our interpretation of §2c no more permits a commandeering of the machinery of state government than does the dissent's understanding of §2a(c). Under our view, if the State fails to redistrict, then federal courts may do so. Under the dissent's view, if the State fails to redistrict (and loses congressional seats), then the federal courts *must* order at-large elections pursuant to §2a(c)(5). See, *e. g., post*, at 299–300. If our reading of §2c runs afoul of any anticommandeering principles, then the dissent commits the same sin.

Another straw man erected by the dissent is to be found in its insistence—as though in response to an argument of ours—that "[s]ince §2a(c) was enacted decades before the *Baker* line of cases, this subsequent development cannot change the interpretation of §2a(c)." *Post*, at 307. But we have never said that those cases changed the meaning of

§ 2a(c); we have said that they help to explain the meaning of § 2c, which *was* enacted after they were decided. And it is, of course, the most rudimentary rule of statutory construction (which one would have thought familiar to dissenters so prone to preachment on that subject, see, *e. g., post,* at 298, 304, 307) that courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part, including later-enacted statutes:

> "The correct rule of interpretation is, that if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them . . . . If a thing contained in a subsequent statute, be within the reason of a former statute, it shall be taken to be within the meaning of that statute . . . ; and if it can be gathered from a subsequent statute *in pari materia,* what meaning the legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute." *United States* v. *Freeman,* 3 How. 556, 564–565 (1845).

That is to say, the meaning of § 2c (illuminated by the *Baker* v. *Carr* line of cases) sheds light upon the meaning of § 2a(c).

Finally, the dissent gives the statutory phrase "redistricted in the manner provided by the law thereof" a meaning that is highly unusual. It means, according to the dissent, "redistricted as state law requires," *even when state law is unconstitutional*—so that even an unconstitutional redistricting satisfies the "until" clause of § 2a(c), and enables § 2c to be applied. We know of no other instance in which a federal statute acknowledges to be "state law" a provision that violates the Supremacy Clause and is therefore a legal nullity. It is particularly peculiar for the dissent to allow an unconstitutional redistricting to satisfy the "until" clause when it will *not allow* a nonprecleared redistricting to satisfy the "until" clause (in those States subject to § 5 of the

Voting Rights Act, 42 U. S. C. § 1973c).   See *post*, at 310–312. That is to say, in the dissent's view a redistricted State is not "redistricted" within the meaning of § 2a(c) if the districts have not been precleared, but it is "redistricted" even if the districts are patently unconstitutional (so long as they have been precleared, or the State is not subject to the preclearance requirement).   Section 2a(c), of course, has no "preclearance exception."   If redistricting "in the manner provided by [state] law" is ineffective when a federal statute (§ 5 preclearance) has been disregarded, surely it is also ineffective when the Federal Constitution has been disregarded. It is not we but the dissent that reads into the text of § 2a(c) ("redistricted in the manner provided by [state] law") distinctions that have no basis in reality.

\*     \*     \*

The judgment of the District Court is

*Affirmed.*

JUSTICE KENNEDY, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE BREYER join as to Part II, concurring.

I

I join the Court's opinion and the plurality opinion in Parts III–B and IV.   The Court's opinion makes clear why the District Court was correct to enjoin the redistricting plan developed by the Mississippi State Chancery Court as not precleared under § 5 of the Voting Rights Act of 1965, 42 U. S. C. § 1973c.   *Ante*, at 261–265.   The Court then vacates the District Court's alternative holding that the state-court plan violated Article I, § 4, of the United States Constitution. *Ante*, at 265–266.

II

It seems appropriate to explain why, in my view, our ruling vacating the judgment is mandated by our earlier cases. There is precedent for our ruling.   See *Connor* v. *Waller*,

421 U. S. 656 (1975) *(per curiam); United States* v. *Board of Supervisors of Warren Cty.,* 429 U. S. 642, 646–647 (1977) *(per curiam); Connor* v. *Finch,* 431 U. S. 407, 412 (1977); *Wise* v. *Lipscomb,* 437 U. S. 535, 542 (1978) (opinion of White, J.); see also *post,* at 292 (O'CONNOR, J., concurring in part and dissenting in part). Once the District Court found no preclearance, it was premature, given this statutory scheme, for the court to consider the constitutional question. Where state reapportionment enactments have not been precleared in accordance with § 5, the district court "err[s] in deciding the constitutional challenges" to these acts. *Connor* v. *Waller, supra,* at 656.

The rule prescribed by *Connor* reflects the purposes behind the Voting Rights Act. Concerned that "covered jurisdictions would exercise their ingenuity to devise new and subtle forms of discrimination, Congress prohibited those jurisdictions from implementing any change in voting procedure without obtaining preclearance under § 5." *Hathorn* v. *Lovorn,* 457 U. S. 255, 268 (1982). A jurisdiction covered by § 5 must seek approval of either the Attorney General of the United States or the United States District Court for the District of Columbia. See, *e. g., Clark* v. *Roemer,* 500 U. S. 646, 652 (1991); *Lopez* v. *Monterey County,* 519 U. S. 9, 12 (1996). Absent preclearance, a voting change is neither effective nor enforceable as a matter of federal law. *Connor* v. *Waller, supra,* at 656; *Board of Supervisors, supra,* at 645; *Finch, supra,* at 412; *Wise, supra,* at 542; *Hathorn, supra,* at 269; *Clark, supra,* at 652; *post,* at 311–312 (O'CONNOR, J., concurring in part and dissenting in part). The process, in particular the administrative scheme, is designed to " 'giv[e] the covered State a rapid method of rendering a new state election law enforceable.' " *Georgia* v. *United States,* 411 U. S. 526, 538 (1973) (quoting *Allen* v. *State Bd. of Elections,* 393 U. S. 544, 549 (1969)). To be consistent with the statutory scheme, the district courts should not entertain constitutional challenges to nonprecleared voting changes and in

this way anticipate a ruling not yet made by the Executive. The proposed changes are not capable of implementation, and the constitutional objections may be resolved through the preclearance process.

The constitutional challenge presented to the District Court here fell within the ambit of the *Connor* rule. Our previous cases addressed contentions that the state reapportionment plan violated the one-person, one-vote principle or diluted minority voting strength. *Connor* v. *Waller*, 396 F. Supp. 1308, 1309 (SD Miss. 1975), rev'd, 421 U. S. 656 (1975) *(per curiam); Board of Supervisors, supra,* at 643–644; *Wise, supra,* at 538–539. In this litigation, appellees objected to the constitutionality of the state court's assumption of authority to devise a redistricting plan. The fact that appellees framed their constitutional argument to the state court's authority to pass a redistricting plan rather than to the plan's components does not make their claim reviewable. The plan was not yet precleared and so could not cause appellees injury through enforcement or implementation.

In deciding to address the constitutional challenge the District Court was motivated by the commendable purpose of enabling this Court to examine all the issues presented by the litigation in one appeal. This approach, however, forces the federal courts to undertake unnecessary review of complex constitutional issues in advance of an Executive determination and so risks frustrating the mechanism established by the Voting Rights Act. In these cases, for instance, the District Court's decision led to a delay in preclearance because the United States Attorney General (whether or not authorized to do so by the statute) refused to consider the state-court plan while the constitutional injunction remained in place. App. 28–29. The advance determination, moreover, can risk at least the perception that the Executive is revising the judgment of an Article III court. Adherence to the rule of *Connor* provides States covered by § 5 with time

to remedy constitutional defects without the involvement of federal courts. Given the statutory command of direct review to this Court, it also helps to ensure that only constitutional issues necessary to the resolution of the electoral dispute are brought to us.

JUSTICE STEVENS, with whom JUSTICE SOUTER and JUSTICE BREYER join, concurring in part and concurring in the judgment.

In 1967 Congress enacted a brief statutory provision that banned at-large elections for Representatives. In my opinion the portion of that statute that is codified at 2 U. S. C. § 2c impliedly repealed § 2a(c). The reasons that support that conclusion also persuade me that the 1967 federal Act pre-empted Mississippi's statutory authorization of at-large election of Representatives in Congress. Accordingly, while I join Parts I, II, and III–A of the Court's opinion, I do not join Parts III–B or IV.

The question whether an Act of Congress has repealed an earlier federal statute is similar to the question whether it has pre-empted a state statute. When Congress clearly expresses its intent to repeal or to pre-empt, we must respect that expression. When it fails to do so expressly, the presumption against implied repeals, like the presumption against pre-emption, can be overcome in two situations: (1) if there is an irreconcilable conflict between the provisions in the two Acts; or (2) if the later Act was clearly intended to "cove[r] the whole subject of the earlier one." *Posadas* v. *National City Bank*, 296 U. S. 497, 503 (1936).[1]

---

[1] Compare *Posadas*, 296 U. S., at 503 ("There are two well-settled categories of repeals by implication—(1) where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act"), with *Freightliner*

As I read the 1967 statute it entirely prohibits States that have more than one congressional district from adopting either a multimember district or electing their Representatives in at-large elections, with one narrow exception that applied to the 1968 election in two States. After a rather long and contentious legislative process, Congress enacted this brief provision:

"AN ACT

"For the relief of Doctor Ricardo Vallejo Samala and to provide for congressional redistricting.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, for the purposes of the Immigration and Nationality Act, Doctor Ricardo Vallejo Samala shall be held and considered to have been lawfully admitted to the United States for permanent residence as of August 30, 1959.

"In each State entitled in the Ninety-first Congress or in any subsequent Congress thereafter to more than one Representative under an apportionment made pursuant to the provisions of subsection (a) of section 22 of the Act of June 18, 1929, entitled 'An Act to provide for apportionment of Representatives' (46 Stat. 26), as amended, there shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled, *and Representatives shall be elected only from districts so established,* no district to elect more than one Representative (except that a State which is entitled to more than one Representative and which has in all previous elections elected its Representatives at Large may elect its Representa-

*Corp.* v. *Myrick,* 514 U. S. 280, 287 (1995) ("[A] federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, *English* v. *General Elec. Co.,* 496 U. S. 72, 78–79 (1990), or when state law is in actual conflict with federal law").

tives at Large to the Ninety-first Congress)." Pub. L. 90–196, 81 Stat. 581 (emphasis added).

The second paragraph of this statute enacts a general rule prohibiting States with more than one congressional Representative from electing their Representatives to Congress in at-large elections.[2] That the single exception to this congressional command applied only to Hawaii and New Mexico, and only to the 1968 election, emphasizes the fact that the Act applies to every other State and every other election. Thus, it unambiguously forbids elections that would otherwise have been authorized by § 2a(c)(5). It both creates an "irreconcilable conflict" with the 1941 law and it "covers the whole subject" of at-large congressional elections. *Posadas,* 296 U. S., at 503. Under either of the accepted standards for identifying implied repeals, it repealed the earlier federal statute. In addition, this statute pre-empts the Mississippi statute setting the default rule as at-large elections.

The first paragraph of the 1967 statute suggests an answer to the question why Congress failed to enact an express repeal of the 1941 law when its intent seems so obvious. The statute that became law in December 1967 was the final gasp in a protracted legislative process that began on January 17, 1967, when Chairman Celler of the House Judiciary Committee introduced H. R. 2508, renewing efforts made in the preceding Congress to provide legislative standards responsive to this Court's holding in *Wesberry* v. *Sanders,* 376 U. S. 1 (1964), that the one-person, one-vote principle applies to congressional elections.[3] The bill introduced by Representative Celler in 1967 contained express language replacing

---

[2] The States of Hawaii and New Mexico were the only two States that met the statutory exception because they were "entitled to more than one Representative" and had "in all previous elections elected [their] Representatives at Large." Pub. L. 90–196, 81 Stat. 581.

[3] In 1965, the House of Representatives passed a bill identical, in all relevant respects, to the bill Representative Celler introduced in January 1967. See H. R. 5505, 89th Cong., 1st Sess. (1965).

§ 2a(c) in its entirety.[4]  H. R. 2508, as introduced, had three principal components that are relevant to the implied repeal analysis.  First, the bill required single-member district elections: "[T]here shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled; and Representatives shall be elected only from districts so established, no district to elect more than one Representative."  H. R. 2508, 90th Cong., 1st Sess., 2 (1967).  Second, the bill limited gerrymandering, requiring each district to "at all times be composed of contiguous territory, in as compact form as practicable." *Ibid.* Third, the bill required proportional representation: "[N]o district established in any State for the Ninetieth or any subsequent Congress shall contain a number of persons, excluding Indians not taxed, more than 15 per centum greater or less than the average obtained" by dividing the population by the number of Representatives. *Ibid.*

This bill generated great controversy and discussion.  Importantly for present purposes, however, only two of the three components were discussed in depth at all.  At no point, either in any of the numerous Conference Reports or lengthy floor debates, does any disagreement regarding the language expressly repealing § 2a(c) or the single-member district requirement appear.  Rather, the debate was confined to the gerrymandering requirement, the proportionality rule, and the scope and duration of the temporary exceptions to the broad prohibition against at-large elections.

---

[4] Specifically, § 2a(c) would have been expressly repealed by the following language, present in all but the final version of H. R. 2508: "That section 22 of the Act of June 18, 1929, entitled 'An Act to provide for the fifteenth and subsequent decennial censuses and to provide for apportionment of Representatives' (46 Stat. 26), as amended, is amended as follows:

"Subsection (c) is amended by striking out all of the language in that subsection and inserting in place thereof the following: . . . ."  H. R. 2508, 90th Cong., 1st Sess., 1 (1967).

The House Judiciary Committee amended the bill, limiting the proportional differences between districts in all States to not exceed 10 percent and creating an exception to the general rule for the 91st and 92d Congresses (1968 and 1970 elections) that allowed for "the States of Hawaii and New Mexico [to] continue to elect their Representatives at large" and for the proportional differences to be as large as 30 percent. H. R. Rep. No. 191, 90th Cong., 1st Sess., 1–2 (1967). The House then passed this amended bill. The Senate Judiciary Committee then amended this bill, striking Hawaii from the exception and allowing for 35 percent, rather than 30 percent, variation between districts during the 91st and 92d Congresses. S. Rep. No. 291, 90th Cong., 1st Sess., 1 (1967). The bill went to conference twice, and the conference recommended two sets of amendments. The first Conference Report, issued June 27, 1967, recommended striking any exception to the general rule and limiting proportional variation to 10 percent or less. See H. R. Conf. Rep. No. 435, 90th Cong., 1st Sess., 1–2 (1965). After this compromise failed to pass either the House or the Senate, the conference then recommended a measure that was very similar to the second paragraph of the private bill eventually passed—a general rule requiring single-member districts with an exception, of unlimited duration, for Hawaii and New Mexico. H. R. Conf. Rep. No. 795, 90th Cong., 1st Sess., 1 (1965). Importantly, every version of the bill discussed in the House Report, the Senate Report, and both Conference Reports contained a provision expressly repealing § 2a(c). In spite of these several modifications, the bill, as recommended by the last conference, failed to pass either chamber.

The decision to attach what is now § 2c to the private bill reflected this deadlock. Indeed, proponents of this attachment remarked that they sought to take the uncontroversial components of the prior legislation to ensure that Congress would pass some legislation in response to *Wesberry* v. *Sand-*

*ers,* 376 U. S. 1 (1964).[5]  The absence of any discussion, debate, or reference to the provision expressly repealing § 2a(c) in the private bill prevents its omission from the final bill as being seen as a deliberate choice by Congress.  Any fair reading of the history leading up to the passage of this bill demonstrates that all parties involved were operating under the belief that the changes they were debating would completely replace § 2a(c).

JUSTICE O'CONNOR has provided us with a convincing exposition of the flaws in JUSTICE SCALIA's textual interpretation of § 2a(c)(5).  See *post,* at 298–301 (opinion concurring in part and dissenting in part).  Ironically, however, she has been misled by undue reliance on the text of statutes enacted in 1882, 1891, 1901, and 1911—a period in our history long before the 1950's and 1960's when Congress enacted the voting rights legislation that recognized the central importance of protecting minority access to the polls.  It was only then

---

[5] Senator Bayh introduced one amendment to the private bill that excluded Hawaii and New Mexico while Senator Baker offered another that had no exceptions.  Senator Bayh characterized his amendment as follows: "What I have tried to do is to take that part of the conference report over which there was no dispute, or a minimal amount of dispute, and attach that part to the bill which is now the pending business."  113 Cong. Rec. 31719 (1967).  Senator Baker described his amendment as follows: "The measure makes no other provision.  It has nothing to do with gerrymandering.  It has nothing to do with compactness.  It has nothing to do with census.  It strictly provides in a straightforward manner that when there is more than one Member of the House of Representatives from a State, the State must be districted, and that the Members may not run at large. . . . I believe that my amendment is the most straightforward and direct and simple way to get at the most urgent need in the entire field of redistricting, and that is to prevent the several States of the Union from being under the threat of having their Representatives to the U. S. House of Representatives stand for election at large."  *Id.,* at 31718.

In a colloquy between Senators Bayh and Baker on the floor, they both agreed that the final amendment left no doubt as to its effect: "This will make it mandatory for all Congressmen to be elected by single-Member districts, whether the reapportionment is done by State legislatures or by a Federal court."  *Id.,* at 31720 (remarks of Sen. Bayh).

that an important federal interest in prohibiting at-large voting, particularly in States like Mississippi, became a matter of congressional concern. This intervening and dramatic historical change significantly lessens the relevance of these earlier statutes to the present analysis.

Moreover, her analysis of the implied repeal issue apparently assumes that if two provisions could coexist in the same statute, one could not impliedly repeal the other if they were enacted in successive statutes. Thus, she makes no comment on the proviso in the 1967 statute that preserved at-large elections in New Mexico and Hawaii for 1968. This proviso surely supports the conclusion that it was the only exception intended by Congress from the otherwise total prohibition of at-large elections. The authorization of at-large elections in the 1882 statute cited by JUSTICE O'CONNOR was also set forth in a proviso; although the words "provided that" are omitted from the 1891, 1901, and 1911 statutes, they just contain examples of differently worded exceptions from a general rule. It is also important to note that the text of the 1967 statute, unlike the four earlier statutes, uses the word "only" to create a categorical prohibition against at-large elections. As a matter of plain English, the conflict between that prohibition and § 2a(c), which permitted at-large elections, is surely irreconcilable.

JUSTICE O'CONNOR's consideration of the legislative history of the 1967 statute fails to give appropriate consideration to the four bills that would have expressly repealed § 2a(c)(5). See *supra*, at 287–289. Those bills, coupled with the absence of any expression by anyone involved in the protracted legislative process of an intent to preserve at-large elections anywhere except in New Mexico and Hawaii, provide powerful support for the conclusion that, as a literal reading of the text of § 2c plainly states, Congress intended to enact a categorical prohibition of at-large elections. The odd circumstance that the final version of the prohibition was added to a private bill makes it quite clear that the omission

of a clause expressly repealing § 2a(c) was simply an inadvertence. Canons of statutory construction—such as the presumption against implied repeals or the presumption against pre-emption—are often less reliable guides in the search for congressional intent than a page or two of history.

\* \* \*

The history of the 1967 statute, coupled with the plain language of its text, leads to only one conclusion—Congress impliedly repealed § 2a(c). It is far wiser to give effect to the manifest intent of Congress than, as the plurality attempts, to engage in tortured judicial legislation to preserve a remnant of an obsolete federal statute and an equally obsolete state statute. Accordingly, while I concur in the Court's judgment and opinion, I do not join Parts III–B or IV of the plurality opinion.

JUSTICE O'CONNOR, with whom JUSTICE THOMAS joins, concurring in part and dissenting in part.

I join Parts I and II of the Court's opinion because I agree that the Mississippi Chancery Court's redistricting plan lacks preclearance. I join Part II–C because it is consistent with our decisions holding that federal courts should not rule on a constitutional challenge to a nonprecleared voting change when the change is not yet capable of implementation. See, e. g., Connor v. Waller, 421 U. S. 656 (1975) (per curiam); see also ante, p. 282 (KENNEDY, J., concurring). I cannot join Part III or Part IV, however, because I disagree with the Court that 2 U. S. C. § 2c is a command to the States and I disagree with the plurality regarding the proper statutory construction of § 2a(c)(5).

I

First, I agree with the plurality's somewhat reluctant conclusion that § 2c does not impliedly repeal § 2a(c)(5). Here, it is quite easy to read §§ 2c and 2a(c) together. A natural statutory reading of § 2a(c) gives force to both §§ 2c and 2a(c):

Section 2a(c) applies "[u]ntil a State is redistricted in the manner provided by the law thereof." Section 2c applies *after* a State has "redistricted in the manner provided by the law thereof."

As both the plurality and JUSTICE STEVENS recognize, an implied repeal can exist only if the "provisions in the two acts are in irreconcilable conflict" or if "the later act covers the whole subject of the earlier one and is clearly intended as a substitute." *Posadas* v. *National City Bank*, 296 U. S. 497, 503 (1936). See also *ante*, at 273 (plurality opinion); *ante*, at 285 (STEVENS, J., concurring in part and concurring in judgment). Indeed, "'when two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective.'" *Radzanower* v. *Touche Ross & Co.*, 426 U. S. 148, 155 (1976) (quoting *Morton* v. *Mancari*, 417 U. S. 535, 551 (1974)). We have not found *any* implied repeal of a statute since 1975. See *Gordon* v. *New York Stock Exchange, Inc.*, 422 U. S. 659. And outside the antitrust context, we appear not to have found an implied repeal of a statute since 1917. See *Lewis* v. *United States*, 244 U. S. 134. Because it is not difficult to read §§ 2a(c) and 2c in a manner that gives force to both statutes, § 2c cannot impliedly repeal § 2a(c). See, *e. g.*, *United States* v. *Burroughs*, 289 U. S. 159, 164 (1933) ("[I]f effect can reasonably be given to both statutes, the presumption is that the earlier is intended to remain in force"); *Radzanower* v. *Touche Ross & Co., supra*, at 155 ("Repeal is to be regarded as implied only if necessary to make the [later enacted law] work, and even then only to the minimum extent necessary. This is the guiding principle to reconciliation of the two statutory schemes" (alteration in original and internal quotation marks omitted)).

The previous versions of §§ 2c and 2a(c) confirm that an implied repeal does not exist here. Since 1882, versions of §§ 2c and 2a(c) have coexisted. Indeed, the 1882, 1891, 1901, and 1911 apportionment statutes all contained the single-member district requirement as well as the at-large default

requirement. Compare Act of Feb. 25, 1882, ch. 20, §3, 22 Stat. 6 ("[T]he number to which such State may be entitled . . . *shall be elected by Districts* . . . , no one District electing more than one Representative" (emphasis added)), with *ibid.* (". . . *shall be elected at large,* unless the Legislatures of said States have provided or shall otherwise provide before the time fixed by law for the next election of Representatives therein" (emphasis added)); Act of Feb. 7, 1891, ch. 116, §3, 26 Stat. 735 ("[T]he number to which such State may be entitled . . . *shall be elected by districts*" and "[t]he *said districts shall be equal* to the number of Representatives to which such State may be entitled in Congress, no one district electing more than one Representative" (emphasis added)), with §4, 26 Stat. 736 ("[S]uch additional Representative or Representatives *shall be elected by the State at large*" (emphasis added)); Act of Jan. 16, 1901, ch. 93, §3, 31 Stat. 734 ("[T]he number to which such State may be entitled . . . *shall be elected by districts*" and "[t]he *said districts shall be equal* to the number of Representatives to which such State may be entitled in Congress, no one district electing more than one Representative" (emphasis added)), with §4, 31 Stat. 734 ("[I]f the number hereby provided for shall in any State be less than it was before the change hereby made, then the whole number to such State hereby provided for *shall be elected at large,* unless the legislatures of said States have provided or shall otherwise provide before the time fixed by law for the next election of Representatives therein" (emphasis added)); Act of Aug. 8, 1911, ch. 5, §3, 37 Stat. 14 ("[T]he Representatives . . . *shall be elected by districts*" and "[t]he *said districts shall be equal* to the number of Representatives to which such State may be entitled in Congress, no one district electing more than one Representative" (emphasis added)), with §4, 37 Stat. 14 ("[S]uch additional Representative or Representatives *shall be elected by the State at large* . . . until such State shall be redistricted in the manner provided by the laws thereof").

JUSTICE STEVENS attempts to distinguish the prior versions of §2a(c) because they contained slightly different language from the present version of §2a(c). See *ante,* at 291. Even assuming, however, that the 1882 version of §2a(c) is slightly different from the present version, the versions of §2a(c) in effect in 1891, 1901, and 1911 are materially indistinguishable from the present version. Indeed, the 1911 statute—the one in effect at the time Congress enacted the present version of §2a(c)—is almost word for word the same as the current statute. Compare Act of Aug. 8, 1911, ch. 5, §4, 37 Stat. 14 ("until such State shall be redistricted in the manner provided by the laws thereof"), with 2 U. S. C. §2a(c) ("[u]ntil a State is redistricted in the manner provided by the law therof"). See also *Smiley* v. *Holm,* 285 U. S. 355, 374 (1932) (noting that the 1911 version of §2a(c) would apply "unless and until new districts are created").

Given this history of the two provisions coexisting in the same statute, I would not hold that §2c impliedly repeals §2a(c). The two statutes are "capable of co-existence" because each covers a different subject matter. *Morton* v. *Mancari, supra,* at 551. Section 2c was not intended to cover the whole subject of §2a(c) and was not "clearly intended as a substitute" for §2a(c). *Posadas* v. *National City Bank, supra,* at 503. Section 2a(c) (requiring at-large elections) applies unless or until the State redistricts, and §2c (requiring single-member districts) applies once the State has completed the redistricting process.

This Court has in fact read the prior versions of §§2c and 2a(c) so that the two did not conflict. In *Smiley* v. *Holm, supra,* we recognized that under the 1911 version of these provisions, at-large elections were an appropriate remedy if the State was not properly redistricted in the first instance. See *id.,* at 374 ("[U]nless and until new districts are created, all representatives allotted to the State must be elected by the State at large").

When the 1911 statute expired in 1929, Congress did not reenact it. Instead, Congress passed § 2a(c), which took effect in 1941. Because § 2a(c) concerned only at-large elections, no complementary single-member district requirement existed from 1941 until 1967. In 1967, Congress enacted § 2c, which states in relevant part: "[T]here shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established, no district to elect more than one Representative · . . . ." The relevant language of this statute tracks the language of the prior versions of § 2c. JUSTICE STEVENS' only distinction between the prior versions of § 2c and this version of § 2c is that Congress added the word "only" to the latest version of § 2c. See *ante*, at 288. But this one word is a thin reed on which to rest an implied repeal. JUSTICE STEVENS would hold that instead of expressly repealing § 2a(c), Congress added the word "only" to § 2c. This one-word addition that does not change the meaning of the statute is no basis for finding an implied repeal.

JUSTICE STEVENS argues that Congress intended to "'cove[r] the whole subject'" of at-large redistricting when it enacted § 2c in 1967. *Ante*, at 287 (quoting *Posadas* v. *National City Bank*, 296 U. S., at 503). But the 1967 enactment of § 2c simply restored the prior balance between the at-large mandate and the single-member district mandate that had existed since 1882. To hold that an implied repeal exists, one would have to conclude that Congress repeatedly enacted two completely conflicting provisions in the same statute. The better reading is to give each provision a separate sphere of influence, with § 2a(c) applying until a "State is redistricted in the manner provided by the law thereof," and § 2c applying after the State is redistricted. Because the 1967 version of § 2c parallels the prior versions of § 2c, and because of the longstanding coexistence between the prior versions of §§ 2a(c) and 2c, JUSTICE STEVENS' argu-

ment that Congress "'clearly intended'" §2c "'as a substitute'" for §2a(c) is untenable. *Ante*, at 285, n. 1; *Posadas* v. *National City Bank, supra*, at 503. Cf. *Regional Rail Reorganization Act Cases*, 419 U. S. 102, 134 (1974) ("'Presumably Congress had given serious thought to the earlier statute . . . . Before holding that the result of the earlier consideration has been repealed or qualified, it is reasonable for a court to insist on the legislature's using language showing that it has made a considered determination to that end'").

JUSTICE STEVENS' strongest argument is that the legislative history indicates that "all parties involved were operating under the belief that the changes they were debating would completely replace §2a(c)." *Ante*, at 290. Yet JUSTICE STEVENS acknowledges that Congress *could have* expressly repealed §2a(c). See *ante*, at 287–288, 291–292. JUSTICE STEVENS thinks the evidence that Congress tried to expressly repeal §2a(c) four times cuts strongly in favor of an implied repeal here. See *ante*, at 292. But these four attempts to repeal §2a(c) were unsuccessful. It is difficult to conclude that Congress can impliedly repeal a statute when it deliberately chose not to expressly repeal that statute. In this case, where the two provisions have co-existed historically, and where Congress explicitly rejected an express repeal of §2a(c), I would not find an implied repeal of §2a(c).

I would hold instead that Congress passed §2c in 1967 to restore redistricting law to its pre-1941 status, when §2a(c) became effective without any complementary provision regarding single-member districts. The floor statements and colloquy by Senators Baker and Bayh cited by JUSTICE STEVENS, see *ante*, at 290, n. 5, cannot overcome the strong presumption against implied repeals, especially given the historical evidence that §§2c and 2a(c) had peacefully coexisted since the 19th century. And as explained in more detail in Part II–B, *infra*, the circumstances leading up to the passage of §2c in 1967 do not support a finding of implied repeal.

In short, because §§ 2a(c)(5) and 2c are capable of co-existence, and because the history shows that § 2c does not cover the whole subject of § 2a(c), I agree with the plurality that § 2c does not impliedly repeal § 2a(c), and therefore that § 2a(c) "continues to apply." *Ante,* at 273.

## II

### A

Although the plurality acknowledges that § 2a(c) remains in full force, it inexplicably adopts a reading of § 2a(c) that has no textual basis. Under § 2a(c)(5), the State must conduct at-large elections "[u]ntil a State is redistricted in the manner provided by the law thereof." Instead of simply reading the plain text of the statute, however, the plurality invents its own version of the text of § 2a(c). The plurality holds that "[u]ntil a State is redistricted . . ." means "[u]ntil . . . the election is so imminent that no entity competent to complete redistricting pursuant to . . . the mandate of § 2c [ ] is able to do so without disrupting the election process." *Ante,* at 274, 275. But such a reading is not faithful to the text of the statute. Like JUSTICE STEVENS, I believe that the Court's interpretation of § 2a(c) is nothing more than "tortured judicial legislation." *Ante,* at 292. See also Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175, 1185 (1989) ("[W]hen one does not have a solid textual anchor or an established social norm from which to derive the general rule, its pronouncement appears uncomfortably like legislation").

Dictionary definitions confirm what the plain text says: "Until a State is redistricted in the manner provided by the law thereof" means "[u]ntil a State is redistricted in the manner provided by the law thereof." The meaning of the word "until" is not difficult to understand, nor is it some specialized term of art. See Webster's New International Dictionary 2794 (2d ed. 1957) (defining "until" to mean "[d]uring the whole time before"); Webster's Collegiate Dictionary 1297

(10th ed. 1993) (defining "until" to mean "up to such time as" or "[b]efore"). The word "redistricted" also is not hard to comprehend. *Id.*, at 980 (defining "redistrict" to mean "to divide anew into districts"); Black's Law Dictionary 1283 (7th ed. 1999) (defining "redistrict" to mean "[t]o organize into new districts, esp. legislative ones; reapportion"). While the Court employs dictionary definitions to interpret § 5 of the Voting Rights Act of 1965, see *ante*, at 264, it notably refrains from using any dictionary definition for § 2a(c).

Section 2a(c) contains *no* imminence requirement. It is not credible to say that "until a State is redistricted in the manner provided by the law thereof after any apportionment" means: "[u]ntil . . . the election is so imminent that no entity competent to complete redistricting pursuant to . . . the mandate of § 2c [ ] is able to do so without disrupting the election process." *Ante*, at 275. The plurality characterizes § 2a(c) as a "stopgap provisio[n]," but the text of § 2a(c) is not so limited. *Ibid.* The plurality asks "[h]ow long is a court to await that redistricting before determining that § 2a(c) governs a forthcoming election?" *Ibid.* Yet the text provides *no basis* for why the plurality would ask such a question. Indeed, the text tells us "how long" § 2a(c) should govern: *"[u]ntil a State is redistricted in the manner provided by the law thereof."* (Emphasis added.) Under the plurality's reading, however, § 2a(c) would not apply even though § 2a(c) by its terms *should* apply, as the State has not yet "redistricted in the manner provided by the law thereof." The language of the statute cannot bear such a reading. Cf. *Holloway* v. *United States*, 526 U. S. 1, 14 (1999) (SCALIA, J., dissenting) ("No amount of rationalization can change the reality of this normal (and as far as I know exclusive) English usage. The word in the statute simply will not bear the meaning that the Court assigns").

The dispositive question is what the text says it is: Has a State "redistricted in the manner provided by the law thereof"? 2 U. S. C. § 2a(c). *"Until a State is redistricted*

in the manner provided by the law thereof after any apportionment," a court cannot draw single-member districts. *Ibid.* (emphasis added). The court must apply the terms of § 2a(c) and order at-large elections. If, however, the State is redistricted "in the manner provided by the law thereof," § 2c applies. Thus, *after* a State has been redistricted, if a court determines that the redistricting violates the Constitution or the Voting Rights Act, the correct remedy for such a violation is the § 2c procedure of drawing single-member districts that comport with federal statutory law and the Constitution. But "[u]ntil a State is redistricted in the manner provided by the law thereof," § 2a(c)(5) mandates that a court order at-large elections. In short, a court should enforce § 2a(c) *before* a "State is redistricted in the manner provided by the law thereof," and a court should enforce § 2c *after* a State has been "redistricted in the manner provided by the law thereof."

The plurality seems to forget that in cases such as this one, a federal court has the power to redistrict only because private parties have alleged a violation of the Constitution or the Voting Rights Act. Sections 2a(c) and 2c do not create independently enforceable private rights of action themselves. Rather, both these provisions address the *remedy* that a federal court must order if it finds a violation of a constitutional or statutory right.[1] The federal plaintiffs in

---

[1] It does not matter whether § 2a(c) applies exclusively to legislative redistricting. Under the terms of § 2a(c), courts can be involved in the redistricting process. To the extent that courts are part of the "manner provided by the law thereof," courts may redistrict. 2 U. S. C. § 2a(c). And contrary to the plurality's interpretation, the text of § 2a(c) makes clear that this "manner" refers exclusively to state law. The *manner* in which a State redistricts can only refer to the *process* by which a State redistricts. Moreover, the plurality's conflation of state and federal law is in substantial tension with this Court's opinion in *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89 (1984) (delineating a distinction between state and federal law when a federal court enters an injunction).

this litigation alleged a constitutional violation, and the federal court drew a plan to remedy that violation. Having found a constitutional violation, the federal court was required to fashion the appropriate remedy of § 2c or § 2a(c) depending on whether the "State is redistricted in the manner provided by the law thereof." 2 U. S. C. § 2a(c).

The plurality's reading of § 2a(c) also fails on its own terms. As the plurality appears to acknowledge, *ante,* at 277, the plain text of § 2a(c) requires courts to apply § 2a(c) before applying § 2c. Yet the plurality never justifies why, when it is interpreting § 2a(c), it looks to § 2c instead of reading the plain language of § 2a(c) itself. If state law really includes federal law, as the Court maintains, both §§ 2c and 2a(c) are equally applicable. The text of § 2a(c) directs federal courts to order at-large elections "[u]ntil a State is redistricted in the manner provided by the law thereof." In deciding whether § 2c or § 2a(c) is applicable, it is no answer to escape the directive of § 2a(c) by pointing to the text of § 2c. Indeed, if one takes at face value the plurality's statement that § 2a(c) "continues to apply," *ante,* at 273, a court should not look at § 2c until the State complies with the terms of § 2a(c). Section 2a(c) is antecedent to § 2c, since § 2a(c) defines when at-large elections are appropriate.

Moreover, the Court's interpretation of the interplay between §§ 2a(c) and 2c calls into question this Court's anti-commandeering jurisprudence. See, *e. g., New York* v. *United States,* 505 U. S. 144, 166 (1992) ("We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts"); and *Printz* v. *United States,* 521 U. S. 898, 912 (1997) (SCALIA, J.) ("[S]tate legislatures are *not* subject to federal direction"). The plurality states that the anticommandeering jurisprudence is inapplicable to Article I, § 4, because that section gives Congress the power to "Regulat[e]" the times, places, and manner of

holding congressional elections. But of course, Article I, § 8, uses similar language when it authorizes Congress to "regulate Commerce . . . among the several States." Whether the anticommandeering principle of *New York* and *Printz* is as robust in the Article I, § 4, context (the font of congressional authority here) as it is in the Article I, § 8, context (the source of congressional authority in those cases) is a question that need not be definitively resolved here. In any event, the canon of constitutional avoidance counsels strongly against the reading of §§ 2c and 2a(c) adopted in Parts III and IV of the principal opinion. The Court's reading of § 2c, see *ante,* at 271–272—also adopted by JUSTICE STEVENS— invites a future facial attack to the constitutional validity of § 2c.[2]

The history of the prior versions of § 2c shows that § 2c has *never* been treated as an absolute command. States routinely used at-large elections under the previous iterations of § 2c, even though those versions of § 2c also stated that Representatives "shall be elected by districts." Act of June 25, 1842, ch. 47, § 2, 5 Stat. 491; Act of July 14, 1862, ch. 170, 12 Stat. 572; Act of Feb. 2, 1872, 17 Stat. 28; cf. *supra,* at 293–294 (documenting the 1882, 1891, 1901, and 1911 versions of § 2c). See also K. Martis, Historical Atlas of United

---

[2] It is just as coercive for Congress to say that if the State does not comply with a legislative command, a federal court will enter an injunction making the State conform with Congress' command. See, *e. g., New York v. United States,* 505 U. S. 144, 174–177 (1992) (striking down Congress' "take title" provision because the choice between two unconstitutional choices is "no choice at all"). If § 2c is not a command, however, a State has the choice between passing redistricting legislation or using at-large elections. Section 2c merely limits the type of remedies that a federal court may adopt in response to a pre-existing violation of federal law. Neither it nor § 2a(c) affirmatively provides courts the authority to draw districts absent a violation. Rather, § 2a(c) specifies which remedy is appropriate for the constitutional violation. See 2 U. S. C. § 2a(c) (a court must order at-large elections "[u]ntil a State is redistricted in the manner provided by the law thereof").

States Congressional Districts 1789–1983, pp. 4, 6 (1982) (hereinafter Martis) (documenting 36 States that used at-large elections from the 28th Congress—after Congress passed the first version of § 2c in 1842—through the 70th Congress, when the last version of § 2c expired in 1929).[3] Indeed, in *every* Congress from 1843 until 1929, at least one State used some form of at-large representation.

Unless the Court is willing to say that these States openly flouted federal law, the only way to read this history is to acknowledge that § 2c is not a statutory command. But see *ante*, at 275 (plurality opinion) (§ 2c is a "statutory comman[d]"). Rather, § 2c and its predecessors tell States what type of redistricting legislation they are allowed to pass (all others being prohibited). This reading also comports with the pre-1842 history of congressional elections. Before Congress passed its first version of § 2c in 1842, States routinely would elect more than one individual from a specific district. See Martis 4–5 (listing five States—Maryland, Massachusetts, New Jersey, New York, and Pennsylvania—that used multimember districts from the 3d Congress in 1793 through the 27th Congress in 1842). After the first version of § 2c

---

[3] Alabama (43d, 44th, 63d, 64th Congresses), Arkansas (43d, 48th Congresses), California (31st–38th, 48th Congresses), Colorado (58th–63d Congresses), Connecticut (58th–62d Congresses), Florida (43d, 63d Congresses), Georgia (28th, 48th Congresses), Iowa (29th Congress), Kansas (43d, 48th, 53d–57th, 59th, 60th Congresses), Idaho (63d–65th Congresses), Illinois (37th–42d, 53d, 63d–70th Congresses), Indiana (43d Congress), Louisiana (43d Congress), New York (43d, 48th Congresses), Maine (48th Congress), Michigan (63d Congress), Minnesota (35th–37th, 63d Congresses), Mississippi (28th, 29th, 33d Congresses), Missouri (28th, 29th Congresses), Montana (63d–65th Congresses), New Hampshire (28th, 29th Congresses), New Mexico (62d Congress), North Carolina (48th Congress), North Dakota (58th–62d Congresses), Ohio (63d Congress), Oklahoma (63d Congress), Pennsylvania (43d, 48th–50th, 53d–57th, 63d–67th Congresses), South Carolina (43d Congress), South Dakota (51st–62d Congresses), Tennessee (43d Congress), Texas (43d, 63d–65th Congresses), Utah (63d Congress), Virginia (48th Congress), Washington (53d–60th, 63d Congresses), West Virginia (63d, 64th Congresses), Wisconsin (30th Congress).

went into effect, however, States could no longer use multi-member districts. Rather, States could either redistrict using single-member districts or use at-large elections. In short, § 2c does not tell States that they must pass redistricting legislation. Section 2c is instead a restriction on the *type* of legislation that a State may pass—a restriction completely consistent with *New York* and *Printz*. And § 2a(c) provides that at-large elections will be the default mechanism if States choose not to pass redistricting legislation.

An interpretation of § 2a(c) which mandates that courts order at-large elections "[u]ntil a State is redistricted in the manner provided by the law thereof" does not mean that once a redistricting plan is in effect, § 2a(c) applies if a court later deems the apportionment plan invalid. The words of § 2a(c) specifically refer to the process in which the State redistricts: "in the manner provided by the law thereof." Section 2a(c) is no longer implicated after the State finishes its process of redistricting "in the manner provided by the law thereof after any apportionment." When all required action by the State is complete, and when the state plan first becomes effective, the "State is redistricted in the manner provided by the law thereof." *Ibid.*

## B

Because the plurality's construction of § 2a(c) has no statutory basis, the only way to understand the Court's opinion is that the Court is overlooking the words of the statute for nontextual prudential reasons. Cf. A. Scalia, A Matter of Interpretation 18–23 (1997) (discussing the case of *Church of Holy Trinity* v. *United States*, 143 U. S. 457 (1892), and noting that "Congress can enact foolish statutes as well as wise ones, and it is not for the courts to decide which is which and rewrite the former").

The only other prudential reason why the plurality would distort the plain text of § 2a(c) is to hold *sub silentio* that

§ 2c impliedly repeals § 2a(c). Why else would the plurality note the "tension" between the two statutes, *ante,* at 273, note that "[t]here is something to be said for [the implied repeal] position," *ibid.,* and engage in such a long exegesis about the historical context surrounding the enactment of § 2c? See *ante,* at 268–271 (majority opinion). The plurality adopts the reading of § 2a(c) proposed by one District Court in a 1982 decision. See *Carstens* v. *Lamm,* 543 F. Supp. 68 (Colo. 1982). As the United States recognizes in its brief, the reasoning of *Carstens* is nothing less than a *partial implied repeal* of § 2a(c). See Brief for United States as *Amicus Curiae* 29. ("Section 2c's unequivocal mandate that Members of the House of Representatives should be elected from single-member districts (except where exigencies of time render that impracticable, see *Carston [sic]* v. *Lamm, supra*) resolves that problem. It creates a workable and sensible regime that faithfully fulfills Congress's purpose when it enacted Section 2c in 1967"); see also *id.,* at 10 ("While . . . repeal by implication is disfavored, so is failure to give a later-enacted statute the full scope that its terms require").

Moreover, neither the plurality nor JUSTICE STEVENS can rely on the historical context of the pre-1967 cases to support their interpretations of §§ 2a(c) and 2c. This history in fact cuts against them. It is true that before 1967, some district courts threatened to impose at-large elections if the state redistricting plan were ruled unconstitutional. See *ante,* at 269–270 (majority opinion) (citing cases). In all these cases, however, a legislature had already redistricted "in the manner provided by the law thereof." 2 U. S. C. § 2a(c).[4]

---

[4] See, *e. g., Calkins* v. *Hare,* 228 F. Supp. 824, 825 (ED Mich. 1964) ("The plaintiffs have challenged the constitutionality of the congressional districting in this state"); *Bush* v. *Martin,* 251 F. Supp. 484, 488 (SD Tex. 1966) ("The question is whether the Texas 1965 Congressional Redistricting Act . . . is constitutional"); *Park* v. *Faubus,* 238 F. Supp. 62, 63 (ED

Thus, Congress' response in enacting § 2(c) cannot be read to target anything more than situations in which a State had already "redistricted in the manner provided by the law thereof." And of course, once a State was redistricted in this manner, § 2a(c) by its terms would not apply. If anything, the enactment of § 2c in 1967 clarified that the statutory balance between §§ 2c and 2a(c) that had existed in prior versions of the statute would continue to exist.

The cases cited by the Court do not resolve the question of what happens when a State *fails* to redistrict "in the manner provided by the law thereof." 2 U. S. C. § 2a(c). The Court itself describes these pre-1967 cases as decisions where the courts "are remedying a failure to redistrict constitutionally." *Ante*, at 270. I agree with the Court that when a court strikes down a State's apportionment plan, § 2c mandates that a court "draw single-member districts whenever possible." *Ibid.* The historical context confirms that once a State is redistricted, and the court rules that the plan is unconstitutional, § 2c ensures that courts not order at-large elections. Because in these pre-1967 cases the legislature had redistricted "in the manner provided by the law thereof," § 2a(c) was not applicable. Thus, the Court cannot rely on these pre-1967 cases to support the notion that the

Ark. 1965) ("It is alleged that Act 5 of the Second Extraordinary Session of the Acts of the General Assembly of the State of Arkansas for the year of 1961, being the Act which divides the State of Arkansas into congressional districts, deprives plaintiff and others similarly situated of their right to vote" (citation omitted)); *Preisler* v. *Secretary of State,* 257 F. Supp. 953, 955 (WD Mo. 1966) (The "plaintiffs contest the constitutional validity of Missouri's 1965 Congressional Redistricting Act"); *Meeks* v. *Anderson,* 229 F. Supp. 271, 272 (Kan. 1964) ("The action was brought by qualified voters in four of the five Congressional Districts of Kansas, seeking to have Kansas Statutes, which is the last congressional reapportionment by the Kansas Legislature, declared unconstitutional" (citation omitted)); *Baker* v. *Clement,* 247 F. Supp. 886, 888 (MD Tenn. 1965) ("This case presents the question of whether the statute creating Tennessee's nine congressional districts violates Article 1, Section 2 of the Constitution of the United States").

historical context surrounding the enactment of § 2c renders § 2a(c) toothless. Indeed, it is unclear why the Court examines this historical context at all. Cf. *Bank One Chicago, N. A.* v. *Midwest Bank & Trust Co.,* 516 U. S. 264, 279 (1996) (SCALIA, J., concurring in part and concurring in judgment) ("In my view a law means what its text most appropriately conveys, whatever the Congress that enacted it might have 'intended.' The law *is* what the law *says,* and we should content ourselves with reading it rather than psychoanalyzing those who enacted it").

The Court also implies that it reads § 2a(c) in the way it does because our decisions in *Baker* v. *Carr,* 369 U. S. 186 (1962), *Wesberry* v. *Sanders,* 376 U. S. 1 (1964), and *Reynolds* v. *Sims,* 377 U. S. 533 (1964), "ushered in a new era in which federal courts were overseeing efforts by badly malapportioned States to conform their congressional electoral districts to the constitutionally required one-person, one-vote standards." *Ante,* at 268. For JUSTICE STEVENS, these decisions explain why Congress passed § 2c. See *ante,* at 287, 289–290. But these watershed opinions cannot change the meaning of § 2a(c). First, a later development cannot change an unamended statute. See *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens,* 529 U. S. 765, 780–784 (2000) (SCALIA, J.). Since § 2a(c) was enacted decades before the *Baker* line of cases, this subsequent development cannot change the interpretation of § 2a(c).

Second, the Court's decision in *Baker* v. *Carr, supra,* rested in large part on the fact that courts were *already* involved in overseeing apportionment cases. Courts had been "directing" redistricting disputes since well before *Baker. Ante,* at 268. Indeed, the Court in *Baker* specifically acknowledged that "[a]n unbroken line of our precedents sustains the federal courts' jurisdiction of the subject matter of federal constitutional claims of this nature." 369 U. S., at 201–202 (citing cases, including *Colegrove* v. *Green,* 328 U. S. 549 (1946)). In *Smiley* v. *Holm,* 285 U. S., at 375, for exam-

ple, we specifically reached the redistricting question, and held that the prior versions of §§ 2c and 2a(c) mandated at-large elections "in the absence of a redistricting act." We held that at-large elections were required "in order to afford the representation to which the State is constitutionally enti-tled, and the general provisions of the Act of 1911 cannot be regarded as intended to have a different import." *Ibid.*

In *Wood* v. *Broom,* 287 U. S. 1 (1932), the Court ruled on an issue strikingly similar to that in front of the Court today: the effect of the prior versions of §§ 2c and 2a(c) when the Mississippi congressional delegation was reduced by one seat. In fact, the District Court in *Wood* made a ruling on statutory grounds that would mirror the post-*Baker* consti-tutional review: "The District Court held that the new dis-tricts, created by the redistricting act, were not composed of compact and contiguous territory, having as nearly as practi-cable the same number of inhabitants, and hence failed to comply with the mandatory requirements of § 3 of the Act of August 8, 1911." 287 U. S., at 5. See also *Hume* v. *Mahan,* 1 F. Supp. 142 (ED Ky. 1932). Likewise, before *Baker,* state courts had enforced prior versions of §§ 2c and 2a(c). See, *e. g., Moran* v. *Bowley,* 347 Ill. 148, 179 N. E. 526 (1932); *State ex rel. Carroll* v. *Becker,* 329 Mo. 501, 45 S. W. 2d 533 (1932). In short, while *Baker* and its progeny expanded the *scope* of federal court review, these cases did not change the fact that this Court recognized federal court jurisdiction over this subject matter at the time of § 2a(c)'s enactment. Therefore, the *Baker* line of cases could not have caused § 2a(c) to magi-cally change meaning.

The plurality also seems to base its *sub silentio* holding of implied repeal on the fact that "[e]ighty percent" of § 2a(c) is "dead letter." *Ante,* at 273. But even assuming that the first four parts of § 2a(c) are currently unconstitutional, they were not necessarily unconstitutional when Congress passed § 2c in 1967. For instance, § 2a(c)(1) specifies that "[i]f there is no change in the number of Representatives, they shall be

elected from the districts then prescribed by the law of such State." While it is true today that no district could in all probability remain exactly the same after an apportionment, it was not true in 1967.

This Court did not hold that a strict zero-deviation rule applied to redistricting cases until the 1983 decision of *Karcher* v. *Daggett*, 462 U. S. 725. Indeed, the decision of this Court in *Wesberry* v. *Sanders, supra,* stated only that congressional districts must be equal to each other "as nearly as is practicable." *Id.,* at 7–8. As JUSTICE STEVENS points out, after *Wesberry,* the House passed a bill in 1965 permitting congressional districts to deviate by as much as 15%. See *ante,* at 287–288. In 1967, in the same Congress that passed § 2c, the House passed a bill permitting congressional districts to deviate by as much as 10%. See *ante,* at 289. And it appears that at least with the State of New Mexico, the congressional apportionment plan did not change after the 1970 census. See Martis 247 (noting that New Mexico used its 1968 districting plan from the 91st through the 97th Congresses—in other words, from 1968 through 1983). These same principles also explain why as of 1967, §§ 2a(c)(2), 2a(c)(3), and 2a(c)(4) were similarly constitutional.

Even if parts of § 2a(c) would be unconstitutional today, a court can redistrict the existing district lines to make the districts constitutional while ordering an at-large election for the additional Representatives. Indeed, this approach best accords with the principle that a federal court's "modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect." *Upham* v. *Seamon,* 456 U. S. 37, 43 (1982) *(per curiam).* And even if only § 2a(c)(5) were constitutional, the plurality correctly recognizes that § 2a(c)(5) is easily severable from the rest of the statute. See *ante,* at 273.

Finally, the fact that a court must enter an order under § 2a(c)(5) mandating at-large elections does not necessarily mean that the plan would violate §§ 2 or 5 of the Voting

Rights Act, 42 U. S. C. §§ 1973, 1973c, or that traditional winner-take-all elections are required on a statewide basis. Rather, as cross-appellants acknowledge, Brief for Cross-Appellants in No. 01–1596, pp. 27–28; Tr. of Oral Arg. 47–48, a court could design an at-large election plan that awards seats on a cumulative basis, or by some other method that would result in a plan that satisfies the Voting Rights Act. Cf. *Growe* v. *Emison*, 507 U. S. 25, 40 (1993); *Rogers* v. *Lodge*, 458 U. S. 613, 616–617 (1982); *Holder* v. *Hall*, 512 U. S. 874, 897–898, 908–912 (1994) (THOMAS, J., concurring in judgment); *Dillard* v. *Chilton County Bd. of Ed.*, 699 F. Supp. 870 (MD Ala. 1988); see also S. Issacharoff, P. Karlan, & R. Pildes, The Law of Democracy 1091–1151 (rev. 2d ed. 2002); Pildes & Donoghue, Cumulative Voting in the United States, 1995 U. Chi. Legal F. 241, 251–257.

In short, I cannot agree that the phrase "[u]ntil a State is redistricted in the manner provided by the law thereof" contains any sort of "imminence" requirement, a requirement without any statutory mooring. And although the plurality claims to hold that § 2c does not impliedly repeal § 2a(c), the plurality's opinion makes sense only if § 2c serves as a partial implied repeal of § 2a(c). It is difficult to say, as the plurality does, that § 2a(c) "continues to apply," *ante*, at 273, and also to say, as the plurality does, that § 2a(c) applies only if "the election is so imminent that no entity competent to complete redistricting pursuant to . . . the mandate of § 2c [ ] is able to do so without disrupting the election process." *Ante*, at 275. Unless and until Congress expressly repeals § 2a(c), I would hold that federal courts are required to order some form of at-large elections "[u]ntil a State is redistricted in the manner provided by the law thereof after any apportionment."

## III

Having concluded that § 2a(c) applies "[u]ntil a State is redistricted in the manner provided by the law thereof after any apportionment," it is necessary to consider the question

that the Court intentionally avoids: whether the State of Mississippi here has been "redistricted in the manner provided by the law thereof." If it has not, § 2a(c) applies, and the District Court should have ordered at-large elections. If it has been "redistricted," the District Court was correct to draw single-member districts under § 2c. Under this Court's consistent case law, and under Mississippi state law, a State is not "redistricted" until the apportionment plan has been precleared under § 5 of the Voting Rights Act, 42 U. S. C. § 1973c. Because Mississippi's plan has not been precleared, I would hold that § 2a(c) applies.

We have held that a "new reapportionment plan enacted by a State . . . will not be considered 'effective as law,' until it has been submitted and has received clearance under § 5." *Wise* v. *Lipscomb*, 437 U. S. 535, 542 (1978) (plurality opinion) (quoting *Connor* v. *Finch*, 431 U. S. 407, 412 (1977)) (citation omitted). Accord, *Connor* v. *Waller*, 421 U. S., at 656 (an apportionment plan is "not now and will not be effective as laws until and unless cleared pursuant to § 5"); *Morris* v. *Gressette*, 432 U. S. 491, 501–502 (1977) ("Section 5 requires covered jurisdictions to delay implementation of validly enacted state legislation until federal authorities have had an opportunity to determine whether that legislation conforms to the Constitution and to the provisions of the Voting Rights Act"); *Clark* v. *Roemer*, 500 U. S. 646, 652 (1991); *Hathorn* v. *Lovorn*, 457 U. S. 255, 269 (1982) ("Our opinions repeatedly note that failure to follow [the preclearance procedures] renders the change unenforceable"). Indeed, in *Hathorn* v. *Lovorn*, we held that Mississippi itself could "not further implement [a] change until the parties comply with § 5." *Id.*, at 270.

Preclearance is the final step in the process of redistricting. If the apportionment plan is not precleared, it is not "effective as law," and cannot be implemented. Under our case law, then, a State is only redistricted once the clearance process is complete. Before a covered jurisdiction receives

clearance, the Federal Government may force the State to make changes to the redistricting plan. Once a State receives preclearance, it may implement a voting change.

The Mississippi Supreme Court has recognized that the redistricting process is not complete until the apportionment plan is cleared: "Voting changes subject to § 5 'will not be effective as law until and unless cleared.'" *In re McMillin*, 642 So. 2d 1336, 1339 (Miss. 1994) (quoting *Connor* v. *Waller*, *supra*, at 656). In *McMillin*, the Mississippi Supreme Court held that a plan for nonpartisan judicial elections passed by the legislature was not yet effective because it had not been precleared. 642 So. 2d, at 1339. Consequently, the court ordered elections to occur under the *old* plan, which required partisan judicial elections. See *ibid.* ("Consequently, the statutes currently governing primary judicial elections and setting such elections for Tuesday, June 7, 1994, are the only enforceable provisions regarding said primaries"). Thus, despite the fact that the legislature had passed a law mandating nonpartisan judicial elections, despite the fact that the new law *expressly repealed* the old law, despite the fact that the Governor had signed the law, and despite the fact that the State had submitted the new law to the United States Attorney General for preclearance under § 5, this new law was not operative for one reason: The United States Attorney General had not precleared this new law by the time of the new primary elections. See *id.*, at 1338. Thus, at least in Mississippi, the old voting plan remains in effect *until the new plan has been precleared.*

Accordingly, the terms of § 2a(c)(5) should apply here, and the District Court should have ordered at-large elections for the entire state congressional delegation. Congress can expressly repeal § 2a(c) quite easily. But it has not done so. This Court should not presume to act in Congress' stead. And this Court should not read § 2a(c) in a manner divorced from any semblance of textual fidelity in order for it to reach what it deems to be the "correct" or more unintrusive re-

sult. I therefore respectfully dissent from Part III–A of the Court's opinion and Parts III–B and IV of the plurality opinion.