# Authority Under the Defense Base Closure and Realignment Act to Close or Realign National Guard Installations Without the Consent of State Governors

*The federal government has authority under the Defense Base Closure and Realignment Act of 1990, as amended, to close or realign a National Guard installation without the consent of the governor of the state in which the installation is located.*

August 10, 2005

MEMORANDUM OPINION FOR THE CHAIRMAN
DEFENSE BASE CLOSURE AND REALIGNMENT COMMISSION

The Defense Base Closure and Realignment Act of 1990 ("Base Closure Act" or "DBCRA") establishes a process by which the federal government is authorized to close and realign federal military installations in the United States. Pub. L. No. 101-510, § 2901, 104 Stat. 1485, 1808, *reprinted as amended in* 10 U.S.C. § 2687 note (2000 & Supp. IV 2004). You have asked the Attorney General whether the federal government has authority under the Act to close or realign a National Guard installation without the consent of the governor of the state in which the installation is located, particularly given two earlier-enacted statutes that require gubernatorial consent before a National Guard "unit" may be "relocated or withdrawn," 10 U.S.C. § 18238 (2000), or "change[d]" as to its "branch, organization, or allotment," 32 U.S.C. § 104(c) (2000). *See* Letter for Alberto R. Gonzales, Attorney General, from Anthony J. Principi, Chairman, Defense Base Closure and Realignment Commission (May 23, 2005). The Attorney General has delegated to this Office responsibility for rendering legal opinions to the various federal agencies. *See* Foreword, 29 Op. O.L.C. v (2005). We conclude that the federal government has the requisite authority.

## I.

### A.

Congress adopted the Base Closure Act in order "to provide a fair process that will result in the timely closure and realignment of military installations inside the United States." DBCRA § 2901(b).[1] Congress acted against the backdrop of "repeated, unsuccessful, efforts to close military bases in a rational and timely manner." *Dalton v. Specter*, 511 U.S. 462, 479 (1994) (Souter, J., concurring in part and concurring in judgment). The initial Act authorized rounds of closure and realignment for 1991, 1993, and 1995; amendments in 2001 (and again in 2004)

---

[1] Citations of the Act are of the sections as they appear in the note to 10 U.S.C. § 2687 (2000 & Supp. IV 2004).

provided for another round in 2005. *See* National Defense Authorization Act for Fiscal Year 2002, Pub. L. No. 107-107, §§ 3001–3008, 115 Stat. 1012, 1342–53 (2001); Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, div. A, § 1084, div. B, §§ 2831–2834, 118 Stat. 1811, 2064, 2132–34 (2004). While in force, the Base Closure Act (which under current law expires on April 15, 2006) serves as "the exclusive authority for selecting for closure or realignment, or for carrying out any closure or realignment of, a military installation inside the United States." DBCRA § 2909(a).[2] The Act's scope is broad: It defines "installation" as "a base, camp, post, station, yard, center, homeport facility for any ship, or other activity under the jurisdiction of the Department of Defense, including any leased facility." *Id.* § 2910(4). And "[t]he term 'realignment' includes any action which both reduces and relocates functions and civilian personnel positions but does not include a reduction in force resulting from workload adjustments, reduced personnel or funding levels, or skill imbalances." *Id.* § 2910(5).

In addition to reaching broadly, the Act also establishes an "elaborate selection process" for accomplishing its purpose, by assigning specific roles to several federal actors who are subjected to rigid statutory deadlines. *Dalton*, 511 U.S. at 464 (opinion of Court). The process for the 2005 round begins when the Secretary of Defense certifies to Congress that a need exists to close and realign military installations and that such closures and realignments would "result in annual net savings for each of the military departments." DBCRA § 2912(b)(1)(B). The process may proceed thereafter only if, no later than March 15, 2005, the President nominates for Senate consideration persons to constitute the Defense Base Closure and Realignment Commission. *Id.* § 2912(d). Although the Commission's actions are expressly subject to the approval or disapproval of the President (as explained below) and the Act does not restrict the removal of commissioners, the Commission is "independent" of other federal departments, agencies, or commissions. *Id.* § 2902(a); *see generally Removal of Holdover Officials Serving on the Federal Housing Finance Board and the Railroad Retirement Board*, 21 Op. O.L.C. 135, 135, 138 n.5 (1997); *see also Holdover and Removal of Members of Amtrak's Reform Board*, 27 Op. O.L.C. 163, 166–68 (2003).

The next step after the nomination of commissioners is for the Secretary of Defense to develop a list of the military installations in the United States that he recommends for closure or realignment; he must submit that list to the Commission by May 16, 2005. DBCRA § 2914(a). In preparing his list, the Secretary must

---

[2] The Act makes an exception for closures and realignments not covered by 10 U.S.C. § 2687. *See* DBCRA § 2909(c)(2). Section 2687 applies to closures of military installations at which 300 or more civilians are employed and to realignments of such installations that involve a reduction by more than 1,000 (or fifty percent) of the civilian personnel. In other words, small closures and realignments are not subject to the Act's exclusivity provision. This does not mean, however, that such closures and realignments *cannot* be carried out under the Act.

"consider all military installations inside the United States equally without regard to whether the installation has been previously considered or proposed for closure or realignment by the Department." *Id.* § 2903(c)(3)(A). The Secretary's recommendations must be based on his previously established and issued "force-structure plan" and a "comprehensive inventory of military installations." *Id.* § 2912(a)(1). Congress also has enumerated four "military value criteria," *id.* § 2913(b), and four "other criteria," *id.* § 2913(c), on which the Secretary must rely, and has provided that these, along with the plan and inventory, shall be the "only criteria" on which he relies, *id.* § 2913(f). (In prior rounds, Congress left with the Secretary discretion to establish the selection criteria. *Id.* § 2903(b).)

The Commission must hold public hearings and prepare a report reviewing the Secretary's recommendations and setting out the Commission's own recommendations. *Id.* § 2903(d). Just as it has restricted the Secretary in preparing the original list, so also has Congress constrained the Commission's authority to alter the Secretary's list. The Commission may do so only if it "determines that the Secretary deviated substantially from the force-structure plan and final criteria." *Id.* § 2903(d)(2)(B). And the Commission must make additional findings and follow additional procedures if it proposes to close or realign an installation that the Secretary has not recommended for closure or realignment or to increase the extent of a realignment. *Id.* §§ 2903(d)(2)(C)–(D), 2914(d)(3), (d)(5). The Commission must transmit its report and recommendations to the President no later than September 8, 2005. *Id.* § 2914(d).

Within two weeks of receiving the Commission's report, the President must issue his own report "containing [his] approval or disapproval of the Commission's recommendations." *Id.* § 2914(e)(1). The Act "does not at all limit the President's discretion in approving or disapproving the Commission's recommendations." *Dalton*, 511 U.S. at 476; *see also id.* at 470. But it does require his review to be "all-or-nothing," *see* DBCRA § 2903(e); he "must accept or reject the entire package offered by the Commission," 511 U.S. at 470. If he disapproves, the Commission may prepare a revised list, which it must send to the President by October 20, 2005. DBCRA § 2914(e)(2). Presidential rejection of that list ends the process; no bases may be closed or realigned. *Id.* § 2914(e)(3). If, however, the President approves either the original or revised recommendations, he sends the approved list, along with a certification of approval, to Congress. *Id.* § 2903(e)(2), (e)(4).

Each of the above steps is necessary for any closures or realignments to occur under the Act. If Congress does not enact a joint resolution disapproving the Commission's recommendations within forty-five days after the transmittal from the President, the Secretary of Defense must implement the entire list. *Id.* § 2904. The Act goes on to specify in great detail the procedures for implementing these closures and realignments. *Id.* § 2905.

## B.

The modern National Guard descends from efforts that Congress began in the early twentieth century both to revive the long-dormant "Militia" described in the Constitution and, spurred by World War I, to make it an effective complement to the regular Armed Forces. *See generally Perpich v. Dep't of Defense*, 496 U.S. 334, 340–46 (1990). Among its several provisions relating to the militia, the Constitution grants to Congress power to "provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States," while "reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress." U.S. Const. art. I, § 8, cl. 16. Acting pursuant to this power, Congress in 1903 passed the Dick Act, ch. 196, 32 Stat. 775, which provided among other things for an organized militia, known as the National Guard of the several states, that would be organized in the same way as the regular Army, trained by regular Army instructors, and equipped through federal funds. *Perpich*, 496 U.S. at 342. For historical and constitutional reasons, it was thought that this force could not be used outside of the United States. *See Whether the Second Amendment Secures an Individual Right*, 28 Op. O.L.C. 126, 152–53 (2004) ("*Second Amendment*").

Partly to overcome this restriction, Congress in the National Defense Act of 1916, ch. 134, 39 Stat. 166, further federalized the National Guard pursuant to its power, among others, to "raise and support Armies." U.S. Const. art. I, § 8, cl. 12; *see Selective Draft Law Cases*, 245 U.S. 366, 377 (1918). The National Defense Act "provide[d] for greater federal control and federal funding of the Guard," "authorized the President to draft members of the Guard into federal service," and provided that the Army should include both the regular Army and the National Guard while in federal service. *Perpich*, 496 U.S. at 343–44. The Court in the *Selective Draft Law Cases* and *Cox v. Wood*, 247 U.S. 3 (1918), upheld the draft provisions of the National Defense Act, concluding, among other things, that Congress's power to raise and support armies was "not qualified or restricted by the provisions of the militia clause," *Cox*, 247 U.S. at 6. The Court reaffirmed this interpretation in *Perpich*, 496 U.S. at 349–50.

In 1933, Congress gave the National Guard much of its current shape by creating two overlapping organizations whose members have dual enlistment: the National Guard of the various states and the National Guard of the United States, the latter forming a permanent reserve corps of the federal Armed Forces. *See* Act of June 15, 1933, ch. 87, 48 Stat. 153; *Perpich*, 496 U.S. at 345; *see also* 10 U.S.C. § 101(c) (2000) (distinguishing between these two entities); *id.* § 10101 (defining the "reserve components of the armed forces" to include the Army and Air National Guard of the United States); *see also id.* §§ 10105, 10111 (2000) (similar). Today, the federal government "provides virtually all of the funding, the materiel, and the leadership for the State Guard units," although Congress

continues, arguably for constitutional reasons, to allow a state to provide and maintain at its own expense a defense force outside of this system. *Perpich*, 496 U.S. at 351–52; 32 U.S.C. § 109(c) (2000). The National Guard of the United States is thus at all times part of the Armed Forces of the United States. The requirement of dual enlistment set up in 1933 means that a member of the National Guard simultaneously performs two distinct roles: Armed Forces reservist and state militiaman. Under ordinary circumstances, National Guard units retain their status as state militia units, under the ultimate command of the governor of the state in which the unit is located. *See* 10 U.S.C. § § 10107, 10113 (2000). Under certain conditions, however, the President can order those units into active federal service, just as he can order any other component of the Armed Forces into active duty. *See* 10 U.S.C. § 12301 (2000 & Supp. IV 2004). For as long as they remain in federal service, members of the National Guard are relieved of their status in the State Guard, *see* 32 U.S.C. § 325(a) (2000 & Supp. IV 2004); *Perpich*, 496 U.S. at 345–46, and their units become exclusively components of the United States Armed Forces, *see* 10 U.S.C. §§ 10106, 10112 (2000).

## II.

### A.

Your letter to the Attorney General requests an answer to the question whether the federal government, when following the procedures described in the Base Closure Act, has authority to recommend and carry out the closure or realignment of a National Guard installation without obtaining the consent of the governor of the state in which the installation is located.

As an initial matter, the authority and procedures of the Base Closure Act undoubtedly do extend to National Guard installations, just as they do to any other type of military installation under the jurisdiction of the Department of Defense. The Act is comprehensive in its coverage. In broadly defining "military installation," DBCRA § 2910(4) (quoted above), the Act makes no distinction between installations associated with the National Guard and those associated with any other component of the Armed Forces. Indeed, the Secretary's required inventory of military installations must include facilities in both the "active and reserve forces," *id.* § 2912(a)(1)(B), which plainly includes the National Guard, *see* 10 U.S.C. § 10101. We understand that all of the National Guard installations recommended by the Secretary for closure or realignment in the current round are located on land either owned or leased by the Department of Defense. Such installations are included within the definition of "military installation" and are thus presumptively subject to closure or realignment under the Act. Similarly, the Act's definition of "realignment," which "includes any action which both reduces and relocates functions and civilian personnel positions," DBCRA § 2910(5), provides no basis for distinguishing the National Guard. Nothing in that definition

suggests that such actions are not equally covered whether they involve active or reserve forces, the regular military or the National Guard. It is therefore not surprising that in previous rounds both the Secretary and the Commission made recommendations to close or realign National Guard installations, or that the Secretary has made such recommendations in the current round.

As your letter recognizes, however, two statutes might be read to restrict the federal government's ability to carry out such closures and realignments. These are 10 U.S.C. § 18238 and 32 U.S.C. § 104(c). Considering each provision in turn, we conclude that neither affects the exercise of authority under the Base Closure Act.

**B.**

Section 18238 provides in full as follows:

> A unit of the Army National Guard of the United States or the Air National Guard of the United States may not be relocated or with-drawn *under this chapter* without the consent of the governor of the State or, in the case of the District of Columbia, the commanding general of the National Guard of the District of Columbia.

(Emphasis added.) Section 18238 by its terms applies only to relocations or withdrawals "under this chapter." The applicable chapter of title 10 is chapter 1803, which comprises sections 18231 to 18239. The Base Closure Act, however, is not included in chapter 1803. Public Law 107-107, which authorizes the current round of closings and realignments, is a distinct legal authority, and the Act has been included as a note to 10 U.S.C. § 2687, which is part of chapter 159. By its terms, therefore, section 18238 does not apply to the Base Closure Act because the Act is not part of "this chapter" (i.e., chapter 1803) and action under the Act therefore is not, and cannot be, action under chapter 1803. Thus, as the plain text of the provision makes clear, section 18238 has no bearing on the scope of authority exercised under the Act.

This reading of the current text is confirmed by the statutory history of section 18238. The provision was originally enacted as section 4(b) of the National Defense Facilities Act of 1950, ch. 945, 64 Stat. 829, 830. Section 4(b) applied only to situations in which the location of a National Guard unit was changed "pursuant to any authority *conferred by this Act*." *Id*. (emphasis added).[3] This limiting clause was modified to "under this chapter" in 1956 when the Facilities

---

[3] Section 4(b) required merely that the relevant governor be "consulted." 64 Stat. at 830. A subsequent amendment added the phrase "and shall have consented." Pub. L. No. 84-302, § 1(c), 69 Stat. 593, 593 (1955). In 1958, the wording was changed to the current "without the consent" version, and the phrase "shall have been consulted" was omitted as surplusage. Pub. L. No. 85-861, § 1(43), 72 Stat. 1437, 1457 (1958); S. Rep. No. 85-2095, at 33 (1958), *reprinted in* 1958 U.S.C.C.A.N. 4615, 4634.

Act was first codified in title 10 as part of the codification of military law into titles 10 and 32. Pub. L. No. 84-1028, sec. 1, § 2238, 70A Stat. 1, 120, 123 (1956).[4] As was generally the case in the 1956 codification, no change in meaning was intended. *Id*. sec. 49(a), 70A Stat. at 640 ("In sections 1–48 of this Act, it is the legislative purpose to restate, without substantive change, the law replaced by those sections"); *see also Schacht v. United States*, 398 U.S. 58, 62 n.3 (1970) ("Although the 1956 revision and codification were not in general intended to make substantive changes, changes were made for the purpose of clarifying and updating language."); S. Rep. No. 84-2484, at 19 (1956), *reprinted in* 1956 U.S.C.C.A.N. 4632, 4640 ("The object of the new titles has been to restate existing law, not to make new law. Consistently with the general plan of the United States Code, the pertinent provisions of law have been freely reworded and rearranged, subject to every precaution against disturbing existing rights, privileges, duties, or functions."); *Fairbank v. Schlesinger*, 533 F.2d 586, 600 (D.C. Cir. 1975) (observing that "the codification of the Armed Forces statutes in 1956, according to the provisions of the codification and the committee reports, did not intend to make any changes in the law") (footnote omitted); *id*. at 595 & n.20 (discussing the codification).

Both text and history thus make clear that the gubernatorial consent requirement contained in section 18238 applies *only* where the federal government is acting under the authority conferred by the Facilities Act, as now codified in chapter 1803 of title 10. The Commission is certainly not doing so here. It is instead acting under the authority of the Base Closure Act—its only source of authority or even existence—without any reliance on chapter 1803, just as the President and later the Secretary of Defense will act solely under the Act as the process continues. Moreover, the Commission is performing actions distinct from those for which chapter 1803 provides authority. The primary purpose of that chapter is to provide for "the acquisition" in various ways "of facilities necessary for the proper development, training, operation, and maintenance of the reserve components of the armed forces, including troop housing and messing facilities." 10 U.S.C. § 18231 (2000); *see also* H.R. Rep. No. 81-2174, at 1 (1950) (stating similar purpose of original Facilities Act). To that end, chapter 1803 authorizes the Secretary of Defense to acquire or build facilities with federal money, as well as to make contributions to the states. *See* 10 U.S.C. § 18233 (2000 & Supp. IV 2004). Those contributions are to be used either to convert existing facilities for joint use by more than one reserve unit, *id.* § 18233(a)(2), or to acquire or convert new facilities "made necessary by the conversion, redesignation, or reorganization of units" of the National Guard of the United States by the Secretary of the relevant military department, *id.* § 18233(a)(3).

---

[4] Section 4(b) then became 10 U.S.C. § 2238, part of chapter 133. In 1994, Congress redesignated chapter 133 as chapter 1803, and sections 2231–2239 as sections 18231–18239, with section 2238 becoming section 18238. Pub. L. No. 103-337, § 1664(b), 108 Stat. 2663, 3010 (1994).

All of this federally funded construction for the benefit of the National Guard naturally could lead to the relocation of certain Guard units to new facilities. In these circumstances, section 18238 requires gubernatorial consent before a unit is "withdrawn" from its existing facility or "relocated" to a new one. The provision thus limits the ability of the Secretary of Defense to relocate National Guard units unilaterally *as an incident* of his powers under chapter 1803 to provide new facilities for the reserve components of the Armed Forces. In contrast, when the federal government uses the Base Closure Act to close or realign military installations—and thereby to relocate National Guard units—its power in no way derives from chapter 1803.

The same analysis applies even if the closure or realignment of a National Guard facility pursuant to the Base Closure Act should ultimately require the federal government to acquire land or construct facilities. That Act provides independent statutory authority for such development activity, by authorizing the Secretary of Defense to "take such actions as may be necessary to close or realign any military installation, including *the acquisition of such land, [or] the construction of such replacement facilities . . .* as may be required to transfer functions from a military installation being closed or realigned to another military installation." DBCRA § 2905(a)(1)(A) (emphasis added). Here again, because the exercise of such authority would not depend on anything in chapter 1803, it would be unconstrained by section 18238.[5]

## C.

Section 104(c) of title 32 provides in full as follows:

> To secure a force the units of which when combined will form complete higher tactical units, the President may designate the units of the National Guard, by branch of the Army or organization of the Air Force, to be maintained in each State and Territory, Puerto Rico, and the District of Columbia. However, no change in the branch, organization, or allotment of a unit located entirely within a State may be made without the approval of its governor.

32 U.S.C. § 104(c). Related to this provision, section 104(a) authorizes each state to "fix the location of the units and headquarters of its National Guard," and

---

[5] There is an additional reason for not reading section 18238 to apply to the Base Closure Act. The Facilities Act grants authority to "the Secretary of Defense." *See, e.g.*, 10 U.S.C. § 18233(a). It follows that section 18238's limitation on that authority applies only to actions taken by the Secretary. Thus, the Facilities Act at least should not be read to apply to actions by the Commission or the President. And given that the final power to require closure or realignment under the Base Closure Act belongs to the President alone, *see Dalton*, 511 U.S. at 469–70, it would be anomalous to read section 18238 to apply to—and conflict with—the Secretary's subsequent duty (discussed above) to implement *all* of the closures and realignments on the list approved by the President.

section 104(b) provides that, except as otherwise specifically provided in title 32, "the organization of" the Army National Guard and Air Force National Guard "and the composition of [their] units" shall be the same as those of their respective branches of the federal Armed Forces.

For two reasons, we conclude that section 104(c) does not constrain actions taken pursuant to the Base Closure Act. First, the text of that section strongly suggests that the second sentence simply qualifies any exercise of authority under the first, and thus that its gubernatorial consent requirement does not apply to the exercise of any separate authority—such as the Base Closure Act—even if that authority may allow similar or overlapping actions. Second, reading the "However" sentence more broadly would so fundamentally undermine the Base Closure Act's detailed and comprehensive scheme that Congress could not have intended such a result. Indeed, the inconsistency between the integrated and exclusive procedures of the Base Closure Act and the requirement imposed by the second sentence of section 104(c) is sufficiently serious that, if the Act and section 104(c) did overlap, we would be compelled to read the former as impliedly suspending operation of the latter to the extent of the overlap.[6] Interpreting section 104(c) not to apply to the Act avoids that result and harmonizes the two statutes in a way fully consistent with the underlying purposes of each, as required by well-established rules of statutory construction.

We begin with the text. The second sentence of section 104(c) refers back to the first sentence in two significant ways; these references suggest that the second sentence's admonition that "no change" may be made without gubernatorial

---

[6] At least some closures or realignments of National Guard installations under the Base Closure Act may be said to involve a "change in the branch, organization, or allotment of a unit located entirely within a State," in which case, if section 104(c) did apply, gubernatorial consent would be required. We understand that phrase to reach only actions that would either alter the affiliation of a particular National Guard "unit" with a particular segment of the regular Armed Forces or move a Guard "unit" out of a state where it had been entirely maintained. This interpretation follows from reading the two sentences of section 104(c) together. In the first sentence, "branch" refers to the part of the Army with which the Guard unit is associated, and "organization" refers to the part of the Air Force. When used in the very next sentence, those terms should be given the same meaning. *Cf. Brown v. Gardner*, 513 U.S. 115, 118 (1994) (observing that the "presumption that a given term is used to mean the same thing throughout a statute [is] . . . surely at its most vigorous when a term is repeated within a given sentence") (citation omitted). Similarly, "allotment" is best understood, in light of the first sentence, to refer to the President's "designat[ion] of units . . . to be maintained in each State." Regulations issued by the National Guard Bureau adopt this interpretation: "Allotment to a state comprises all units allocated to and accepted by the Governor of that state for organization under appropriate authorization documents." National Guard Bureau, Departments of the Army and the Air Force, *Organization and Federal Recognition of Army National Guard Units*, NGR 10-1, § 2-2(a), at 5 (Nov. 22, 2002) (available at http://www.ngbpdc.ngb.army.mil/pubs/10/ngr10_1.pdf , last visited Aug. 12, 2014). Under this reading, section 104(c) would not restrict the transfer of a National Guard unit's federally owned equipment or armaments, so long as the "unit" itself remained in place and its branch or organization were not changed. Although the provision so construed is limited, we understand that certain closures or realignments proposed by the Secretary in the current round may involve relocating an entire National Guard unit out of a given state, which could amount to a change in "allotment."

approval is best read simply to constrain actions conducted under the first sentence's authorization of certain presidential "designat[ions]." For one, the beginning word, "However," is one that necessarily refers to and limits what comes before. For another, the words "branch" and "organization" appear in both sentences of section 104(c). In the first sentence they describe the scope of the President's power; in the second, they describe the scope of the limitation on that power. This parallel construction indicates that the second sentence was intended to apply when the President takes action under the first sentence, not when he acts pursuant to authority conferred on him by entirely separate and distinct authorizations.

This reading finds additional support in the statutory history. What is now section 104(c) is the combined product of the National Defense Act of 1916 and the amendments enacted in 1933. Section 60 of the National Defense Act allowed the President to associate National Guard units with particular branches of the regular Army and to arrange those units geographically so that, when combined, they would form complete tactical units. 39 Stat. at 197. As originally enacted, this section granted no veto authority to the states. In 1933, however, Congress qualified this presidential power, such that section 60 read as follows:

> [T]he President may prescribe the particular unit or units, as to branch or arm of service, to be maintained in each State, Territory, or the District of Columbia in order to secure a force which, when combined, shall form complete higher tactical units: *Provided*, That no change in allotment, branch, or arm of units or organizations wholly within a single State will be made without the approval of the governor of the State concerned.

Act of June 15, 1933, § 6, 48 Stat. at 156. The language of this amendment demonstrates even more clearly that Congress did not intend the gubernatorial consent provision to be a free-standing requirement for all actions taken by the federal government with respect to the National Guard. Instead, the use of a proviso form—linking the second clause to the preceding one both grammatically (by the colon followed by the word "*Provided*") and syntactically (by the repetition of the words "branch" and "arm")—indicates that Congress intended merely to qualify the authority it had previously conferred on the President in the 1916 Act.

This provision reached its current form in the 1956 codification, discussed above in connection with section 18238. *See* Pub. L. No. 84-1028, sec. 2, § 104(c), 70A Stat. at 598. As with the changes made to section 18238, those made to section 104(c) at that time were stylistic, and were not intended to alter the scope or meaning of the provision. *See supra* Part II.B.

Thus, given both the language of the current text and the history of that text, the second sentence of section 104(c) is best read simply as a proviso of the first, i.e.,

as a statement "restricting the operative effect of statutory language to less than what its scope of operation would be otherwise." 2A Norman J. Singer, *Sutherland on Statutes and Statutory Construction* § 47:08, at 235 (6th ed. 2000) ("Sutherland"); *see Ga. R.R. & Banking Co. v. Smith*, 128 U.S. 174, 181 (1888) ("The general purpose of a proviso, as is well known, is to except the clause covered by it from the general provisions of a statute, or from some provisions of it, or to qualify the operation of the statute in some particular."). This textual reading is consistent with the general rule that a proviso should be construed narrowly, *see Comm'r v. Clark*, 489 U.S. 726, 739 (1989), and "to refer only to the things covered by a preceding clause," *Alaska v. United States*, 545 U.S. 75, 106 (2005).

It is true that courts do not always apply the general rule that a proviso is limited to the provision it qualifies. *See* 2A Sutherland § 47:09, at 238–39; *Alaska*, 545 U.S. at 106–07. But our analysis here rests only on the particular text at issue—focusing on the obvious connections between the two sentences of section 104(c), which the statutory history makes even more obvious, as well as on the absence of any language indicating that the proviso was intended to reach beyond the scope of the provision that it qualifies. In addition, the existence of a separate gubernatorial consent provision in section 18238 further suggests that section 104(c)'s proviso was not intended to be comprehensive. Our interpretation thus does not depend on invoking a presumption to clarify a text more naturally read in a different way, but instead relies on what Congress intended when it enacted section 104(c), as evidenced by the words that it used and the context in which it used them. *See* 2A Sutherland § 47:09, at 239–40. All of these indicators point toward giving the proviso a narrow cast.

This textual reading of the scope of section 104(c)'s proviso finds additional support in the rule that seemingly inconsistent statutes should be construed, where their text permits, to avoid a conflict. *See Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."); *California ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. United States*, 215 F.3d 1005, 1012 (9th Cir. 2000) ("[I]t is a well established axiom of statutory construction that, whenever possible, a court should interpret two seemingly inconsistent statutes to avoid a potential conflict."). This rule of statutory construction reinforces the need to construe the proviso narrowly, as a more expansive interpretation would create serious conflicts between section 104(c) and the Base Closure Act. The Act establishes comprehensive procedural and substantive criteria to be used for making base closure and realignment decisions. It imposes strict deadlines on various Executive Branch actors and on Congress; establishes and limits the criteria on which the Secretary may rely in preparing his list of recommendations; establishes and limits the criteria on which the Commission may rely in reviewing and revising the Secretary's list; and constrains the President and Congress to all-or-nothing decisions about the entire package of recommendations. These finely wrought procedures are designed to

be—and can work correctly only if they are—wholly integrated as a single package, exclusive of and unimpeded by external procedural requirements like a gubernatorial veto. Accordingly, we must read section 104(c)'s proviso— consistent with its text and statutory history—as not applying to the exercise of authority under the Base Closure Act.[7] *Cf. United States v. Fausto*, 484 U.S. 439, 453 (1988) ("This classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.").

The potential conflicts between a gubernatorial consent requirement and the Base Closure Act take several forms. First, where it applies and while it is in force, the Act is expressly designated as the "*exclusive* authority" for the closure or realignment of federal military installations in the United States. DBCRA § 2909(a) (emphasis added). This exclusivity would be eviscerated if an entity not given any authority by the Act were nevertheless allowed to *deselect* particular installations from the list of proposed closures and realignments. The Act, in contrast to the roles carefully selected for the Secretary, Commission, President, and Congress, designates no role whatsoever for state governors in the selection process. It would be a serious incursion on the Act's comprehensive procedural scheme to allow a different set of actors, unmentioned in the Act with regard to selection, and operating at an entirely different level of government, to play such a crucial and potentially disruptive role in determining which installations could be closed or realigned. Indeed, such a conclusion would allow state governors to exercise a power that the Act withholds from *all* of the federal actors on which it confers responsibility: the ability to block the closure or realignment of an *individual* installation for *any reason*. In addition, Congress knew how to confer a

---

[7] If we were to read the second sentence of section 104(c) as reaching beyond the section in which it appears, we would be compelled to read the Base Closure Act as impliedly repealing (or, more accurately given the time-limited nature of the Act, temporarily suspending) the proviso to the extent that the proviso would interfere with and constrain the exercise of authority under the Act. *See Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936) (describing the "well-settled" rule that "where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one"); 1A Norman J. Singer, *Sutherland on Statutes and Statutory Construction* § 23:9, at 458 (6th ed. 2002) ("[I]t is only natural that subsequent enactments could declare an intent to repeal preexisting laws without mention or reference to such laws. A repeal may arise by necessary implication from the enactment of a subsequent act."). The general presumption against implied repeals is overcome where there is a clear conflict between provisions enacted at different times or a clear indication that, in enacting the later statute, Congress intended to supplant the earlier one. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 766–67 (2004); *Branch v. Smith*, 538 U.S. 254, 273 (2003); *see also In re Glacier Bay*, 944 F.2d 577, 583 (9th Cir. 1991) (holding that the Trans-Alaska Pipeline Authorization Act impliedly repealed the earlier Limitation Act, because the former was "comprehensive" and its "scheme simply cannot work if the Limitation Act is allowed to operate concurrently"). For the reasons given in the text below, such would plainly be the case here. Congress intended the Base Closure Act to be an integrated, comprehensive, and exclusive statutory scheme, and a limited suspension of the previously enacted proviso in section 104(c) (which was last amended before the Base Closure Act was first enacted in 1990) would be "necessary to make [the Act] work." *Cf. Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 357 (1963).

role on governors (and other non-federal entities) when it wanted them to have one: The Act expressly gives to state and local officials (including governors in some cases) the right to be consulted regarding and even veto certain federal actions, but these are actions implementing the list, *after* it has been approved. *See* DBCRA § 2905(b)(2)(D) & (E), (3)(B) & (D), (5)(B) & (C)(i). In this context, the Act's contrasting silence about the role of state governors in the process of selecting bases for closure and realignment must be considered conclusive. *See, e.g.*, *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

Similarly, applying section 104(c) to the Act would unravel the exclusivity of the selection criteria that Congress has woven into the rules for both the Secretary and the Commission. Under section 2913(f), the "final selection criteria specified in [section 2913] shall be the *only criteria* to be used, along with the [Secretary's] force-structure plan and infrastructure inventory" in determining the Secretary's recommendations (emphasis added). Furthermore, the Secretary in applying these criteria must "consider *all* military installations inside the United States *equally* without regard to whether the installation has been previously considered or proposed for closure or realignment by the Department." DBCRA § 2903(c)(3)(A) (emphases added). Although this provision is not free from ambiguity (the concluding "without regard" clause might be read as limiting the sense of "equally" rather than merely emphasizing one aspect of equal consideration), there is nevertheless tension between this mandate and the application of a unique immunity for National Guard installations. The Commission faces analogous restrictions, as it may depart from the Secretary's recommendations only if, among other things, it determines that he "deviated substantially from the force-structure plan and final criteria." *Id.* § 2903(d)(2)(B); *see also id.* § 2914(d) (imposing other constraints). Thus, the base closure framework is unambiguously designed not to allow either the Secretary or the Commission to make decisions about which installations to close or realign on any additional criteria not described in the Act itself—such as the wishes of state governors. A requirement that gubernatorial consent be obtained before particular installations may be recommended for closure or realignment cannot be squared with this crucial feature of the Act.

Section 2914(b), which Congress added for the 2005 round, confirms this interpretation by expressly allowing one narrow exception from the exclusivity of selection criteria, and giving even that exception a minimal scope. This section requires the Secretary, in developing his recommendations, to "consider any notice received from a local government in the vicinity of a military installation that the government would approve of the closure or realignment of the installation." *Id.* § 2914(b)(2)(A). Yet at the end of the day, "[n]otwithstanding" this requirement, the Secretary must base his recommendations only on "the force-structure plan,

infrastructure inventory, and final selection criteria." *Id.* § 2914(b)(2)(B). The Act makes no comparable provision for state officials—or, indeed, for any officials who *disapprove* a possible closure or realignment. In light of this narrow accommodation of the view of local governments, the exclusion of any accommodation of the views of non-consenting governors is powerful evidence that Congress did not expect—and would not have wanted—a gubernatorial veto provision to impede any action proposed or carried out under the Base Closure Act. *Cf. United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 836 (2001) ("The logic that invests the omission with significance is familiar: the mention of some implies the exclusion of others not mentioned.").

The conflict between an expansively interpreted version of section 104(c) and the comprehensive scheme of the Base Closure Act becomes particularly acute in the context of the President's role under the Act. As previously noted, the Act imposes no constraints on the President's discretion to approve or disapprove the Commission's recommendations. If state governors had a veto power over actions under the Act, however, one of two absurd consequences would follow. On the one hand, the President could take into account a gubernatorial veto. The President's power under the Act, however, is all-or-nothing; he is barred from editing out a particular installation to whose closure or realignment a governor objects. Accordingly, his only option for giving effect to the gubernatorial veto would be to reject the entire list.[8] In such case, the governor would receive a veto power not simply over a particular National Guard installation—which, as explained above, is extraordinary enough in the context of the Act—but rather over the *entire set* of recommended closures and realignments. Such a power not only would exceed the scope of section 104(c) itself, but also would be clearly irreconcilable with a nationwide, federal base closure process that, as described above, provides no role for governors in selecting installations for closure or realignment. On the other hand, the President might disregard a gubernatorial objection (notwithstanding section 104(c)) and approve the entire list. This action, however, would set up yet another conflict: Section 2904(a) of the Act requires the Secretary, in implementing the final list, to "close *all* military installations recommended for closure" and "realign *all* military installations recommended for realignment." DBCRA § 2904(a)(1), (2) (emphases added). In that scenario, the Secretary could not comply with section 104(c) without violating section 2904(a).

Although these specific conflicts are extremely significant, we also cannot overlook that reading section 104(c) to apply to actions under the Base Closure Act would thwart the broader goal of the Act: to replace an essentially ad hoc and politically unworkable process, *see Dalton*, 511 U.S. at 479, 481–82 (opinion of

---

[8] Although the President could return the list to the Commission with objections based on the veto, that would not solve the problem. If the Commission simply deleted the vetoed recommendations, it would violate the exclusivity of selection criteria. If it did not, the President would face the original problem again when the Commission returned the list.

Souter, J.), with a comprehensive, unified, and rational one, "a fair process that will result in the timely closure and realignment of military installations inside the United States," DBCRA § 2901(b). With respect to National Guard installations at least, applying section 104(c) would revive the ills of the pre-Act process. Justice Souter's observations in *Dalton* (on behalf of four Justices) about the incompatibility of the Base Closure Act with judicial review would thus apply with equal force to a gubernatorial veto:

> If judicial review could *eliminate one base* from a package, the political resolution embodied in that package would be destroyed; if such review could eliminate *an entire package*, or leave its validity in doubt when a succeeding one had to be devised, the political resolution necessary to agree on the succeeding package would be rendered the more difficult, if not impossible. The very reasons that led Congress by this enactment to bind its hands from untying a package, once assembled, go far to persuade me that Congress did not mean the courts to have any such power through judicial review.

511 U.S. at 481–82 (emphases added).

For these reasons, a gubernatorial consent requirement would do serious damage to—and thus be incompatible with—the carefully calibrated scheme set up by the Base Closure Act. Under applicable rules of statutory construction, this incompatibility confirms our interpretation that section 104(c)'s proviso qualifies only the power that section 104(c) itself grants.[9] Here, because the power exercised in the base closure process by the Secretary, the Commission, and ultimately the President, including the power to relocate National Guard units, is in no way derived from or dependent on section 104(c), it follows that the proviso does not apply.[10]

---

[9] This interpretation does not render the proviso a nullity. The provision applies whenever the President acts pursuant to the authority granted him by the first sentence of section 104(c). Although the President's decision to rearrange National Guard units under that authority (which he can do at any time) is not constrained by the Base Closure Act's elaborate requirements, he is required in such circumstance to secure gubernatorial permission before altering the branch, organization, or allotment of a unit. Nor does our interpretation produce a result at odds with the proviso's apparent purpose. When Congress in 1933 was in the process of adding to the predecessor of section 104(c) the requirement of gubernatorial consent, the House Committee on Military Affairs stated the reasons for the addition as follows: "[W]here a State has gone to considerable expense and trouble in organizing and housing a unit of a branch of the service," the "State should not arbitrarily be compelled to accept a change." H.R. Rep. No. 73-141, at 6 (1933). The stated goal was to protect states against *arbitrary* changes. Although one might find the closures and realignment wrought by the elaborate process of the Base Closure Act imperfect, one could hardly consider them arbitrary. Indeed, the entire point of the Act is to *reduce* arbitrariness.

[10] Necessarily included within your request is the question whether the authority to close or realign National Guard installations under the Base Closure Act, unrestricted by a requirement of state consent, would violate the Constitution, or, at least, whether we should read sections 18238 and 104(c) broadly

### III.

For the foregoing reasons, we conclude that the federal government, acting pursuant to the Base Closure Act, need not obtain permission from state governors before closing or realigning National Guard installations.

C. KEVIN MARSHALL
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

so as to avoid a possible constitutional violation. We see no basis for an affirmative answer. First, the most plausible source of any constitutional infirmity would be the second Militia Clause. But that clause authorizes *Congress* to provide for "organizing, arming, and disciplining, the Militia," U.S. Const. art. I, § 8, cl. 16, which includes forming the militia into organized units, *Perpich*, 496 U.S. at 350. Indeed, "the Militia Clauses are—as the constitutional text plainly indicates—additional grants of power to Congress," *id.* at 349; and concurrent state power in this area is clearly subordinate to that federal power. *See Second Amendment*, 28 Op. O.L.C. at 162–64. Second, the modern National Guard, intimately connected with the federal Armed Forces, rests to a large extent on Congress's distinct power to raise and support armies, which is not qualified by the Militia Clauses. *See supra* Part I.B. Third, the Act applies only to federal installations, and thus finds further support in Congress's power "to dispose of and make all needful Rules and Regulations respecting the . . . Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. That power is not held at the mercy of the states. *See, e.g.*, *Kleppe v. New Mexico*, 426 U.S. 529, 539, 543 (1976). Finally, as already noted, the original version of what is now section 104(c), in force from 1916 to 1933, contained no requirement of gubernatorial consent; we have located no constitutional objections raised during that time. Rather, the proviso apparently was added in 1933 solely for policy reasons. *See* H.R. Rep. No. 73-141, at 6 (quoted above in note 9).